COMMUNITY RENEWAL SOCIETY, Plaintiff-Appellant, *v.* THE DEPARTMENT OF LABOR *et al.*, Defendants-Appellees.

First District (5th Division)   No. 81—1765

Opinion filed August 20, 1982.

John D. Purdy, Jr., John J. Lawler, and Gregory L. Dose, all of Ross, Hardies, O'Keefe, Babcock & Parsons, of Chicago, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield (Kathleen M. Lien, Assistant Attorney General, of counsel), for appellees.

JUSTICE LORENZ delivered the opinion of the court:

Community Renewal Society, a not-for-profit corporation, appeals from a judgment which affirmed the Director of the Department of

Labor's decision that the Society is not exempt from the requirements of the Unemployment Insurance Act (UIA) (Ill. Rev. Stat. 1979, ch. 48, par. 300 *et seq.*).

The dispositive issue is whether the Director correctly interpreted section 211.3(A) (2) of the Act (Ill. Rev. Stat. 1979, ch. 48, par. 321.3(A) (2)). This section grants an exemption from participation in the unemployment insurance program for any organization "which is operated primarily for religious purposes and which is operated, supervised, controlled or principally supported by a church or convention or association of churches."

In rejecting the Society's claim that it qualified for this exemption, the Director concluded that (a) public worship and religious instruction are the only activities which can qualify as "religious" under the Act; and (b) the exemption only applies to organizations which "by law and in fact" are operated, controlled, or supervised by churches or groups of churches: in other words, the legal right to control, supervise, or operate the organization under its charter or by-laws is as important as the actual exercise of these powers.

We conclude that the Director incorrectly interpreted the statute, and we accordingly reverse his decision and remand for further proceedings. The following facts are material to our decision.

The Society was founded in 1893 as the Chicago City Missionary Society by members of the United Church of Christ. Among its chief activities at present are programs to develop new congregations and maintain existing congregations as members of the United Church of Christ. Other projects include maintaining a conference facility in Woodstock, Illinois, plus programs to combat racism and fund various community organizations.

The Society is run by a board of directors, and the Society's "constitution" requires that a majority of the directors must be members of the United Church of Christ. The directors are elected by two classes of voters: (1) "participating members," consisting of individuals who financially support the Society, and (2) "church representatives" who serve as the delegates of congregations which have helped support the Society and which belong to the Chicago Metropolitan Association of the United Church of Christ.

According to the report of the Department of Labor's hearing officer, a report which the Director affirmed and incorporated in his decision, "During the periods at issue the number of 'church representatives' exceeded the number of votes of the 'participating members' at a ratio of approximately five to three." This estimate of the size of the majority maintained by the church representatives was admittedly

conservative, however, because a number of church representatives also chose to make individual contributions to the Society and, accordingly, they were counted as participating members as well as representatives of their congregations.

The Society's "constitution" and bylaws provide that the Association Minister of the Chicago Metropolitan Association, the church group's chief officer, is automatically a member of the Society's board of directors. Moreover, these documents also provide that half the members of the Society's nominating committee are to be chosen by the Chicago Metropolitan Association. And, the report adopted by the Director states that "[t]hroughout its operation no person has been elected to the [Society's] Board of Directors who has not first been selected by the nominating committee."

In addition, the Society's bylaws provide that the board of directors must consult with the Chicago Association and the Illinois Conference of the United Church of Christ when selecting the Society's executive director. And, still further, the Society has entered into covenants with the Chicago Association and the Illinois Conference in which it agreed to undertake various church-related projects on behalf of the church groups.

Relying on *People ex rel. Carson v. Muldoon* (1922), 306 Ill. 234, 137 N.E. 863, and *People ex rel. McCullough v. Deutsche Evangelisch Lutherische Jehovah Gemeinde Ungeaenderter Augsburgischer Confession ("Deutsche Gemeinde")* (1911), 249 Ill. 132, 94 N.E. 162, the Director concluded that "[t]he Illinois Supreme Court defined religious purpose 'as a use of such property by a religious society or body of persons as a stated place for public worship, Sunday schools, and religious instruction.' " Applying this statement as a definition, the Director ruled that the Society was not operated primarily for religious purposes because neither public worship nor religious instruction were its primary activities.

The Director also ruled that the Society was not operated, supervised, or controlled by a church or group of churches, on the grounds that the Society "was subordinate in fact to its own members and not to the Chicago Metropolitan Association of the United Church of Christ, even though a majority of the [Society's] members may also have been members of the Association of Churches." This ruling was based on the conclusion that "the legislature intended to exempt only those primarily religious organizations which are *by law and in fact*" operated, supervised, or controlled by a church or group of churches. (Emphasis added.) Thus the Director concluded that the Society did not qualify for the exemption even if, as a practical matter, it was

controlled, supervised, or operated by the Chicago area association of United Church of Christ congregations.

I. *Unemployment Insurance*

During the Great Depression, Congress induced State legislatures to create unemployment insurance programs by (1) imposing a Federal excise tax on certain classes of employers; and (2) giving the employers a credit against the tax for contributions made to federally-approved State unemployment insurance programs. *St. Martin Evangelical Lutheran Church v. South Dakota* (1981), 451 U.S. 772, 775, 68 L. Ed. 2d 612, 615-16, 101 S. Ct. 2142, 2145; *California v. Grace Brethren Church* (1982), 457 U.S. 393, 73 L. Ed. 2d 93, 102 S. Ct. 2498 (construing provisions of the Federal Unemployment Tax Act (FUTA), 26 U.S.C.S. secs. 3301-3311).

In response, every State enacted unemployment insurance laws "implementing the federal mandatory minimum standards of coverage." (*St. Martin Evangelical Lutheran Church v. South Dakota* (1981), 451 U.S. 772, 775 n.3, 68 L. Ed. 2d 612, 615-16 n.3, 101 S. Ct. 2142, 2144 n.3.) Mandatory coverage did not extend to all wage earners, however, and FUTA did not impose an excise tax on nonprofit organizations which were tax-exempt under the Internal Revenue Code. (*St. Martin Evangelical Lutheran Church v. South Dakota* (1981), 451 U.S. 772, 776, 68 L. Ed. 2d 612, 616, 101 S. Ct. 2142, 2145.) Consequently, there was no tax-credit incentive for States to extend unemployment insurance coverage to employees of nonprofit organizations.

Then, in 1970, without extending the excise tax to nonprofit organizations, Congress specified that, to obtain Federal certification for their unemployment insurance programs, States must provide coverage for the employees of nonprofit organizations. (Employment Security Amendments of 1970, Pub. L. 91-373, 84 Stat. 695 *et seq.*) But, at the same time that it broadly extended unemployment insurance coverage, Congress enacted section 3309(b) of FUTA which, among other things, exempted from mandatory coverage the employees of any "organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches." 26 U.S.C.S. sec. 3309(b)(1)(B) (1980).

FUTA, therefore, does not require States to extend unemployment insurance coverage to subsection (b)(1)(B) organizations. But neither does the Act prohibit States from covering workers who are not included within the Federal mandatory-minimum standards. *St. Martin Evangelical Luthern Church v. South Dakota* (1981), 451 U.S.

772, 775 n.3, 68 L. Ed. 2d 612, 615-16 n.3, 101 S. Ct. 2142, 2144 n.3.

Using the language of section 3309 verbatim, the Illinois General Assembly decided to excempt from UIA coverage the employees of subsection (b)(1)(B) organizations. (Ill. Rev. Stat. 1979, ch. 48, par. 321.3(A)(2).) So, even though we are dealing with an exemption which is identical to a provision in FUTA, and the United States Supreme Court has specifically reserved for future decision the question of the proper interpretation of the Federal provision (*St. Martin Evangelical Lutheran Church v. South Dakota* (1981), 451 U.S. 772, 782-83 n.12, 68 L. Ed. 2d 612, 620 n.12, 101 S. Ct. 2142, 2148 n.12), our decision is based solely on our interpretation of the Illinois law. *Cf. St. Martin Evangelical Luthern Church v. South Dakota* (1981), 451 U.S. 772, 780 n.9, 68 L. Ed. 2d 612, 618-19 n.9, 101 S. Ct. 2142, 2147 n.9.

II. *"Religious Purposes"*

The Director of the Department of Labor interpreted the phrase "religious purposes" in the Illinois exemption (Ill. Rev. Stat. 1979, ch. 48, par. 321.3(A)(2)), as being limited to public worship and religious instruction. As the Director correctly pointed out, the Supreme Court stated, in the *Deutsche Gemeinde* case, that:

"As applied to the uses of property, a religious purpose means a use of such property by a religious society or body of persons as a stated place for public worship, Sunday schools and religious instruction." 249 Ill. 132, 136-37, 94 N.E. 162, 164.

However, in subsequent discussion of *Deutsche Gemeinde*, the supreme court explained that "[t]his [language] was not stated as inclusive of everything that might in the future be regarded as a use for religious purposes but as illustrative of the nature of such use." (*People ex rel. Carson v. Muldoon* (1922), 306 Ill. 234, 238, 137 N.E. 863, 864.) Furthermore, notwithstanding a discussion of *Deutsche Gemeinde*, the supreme court has also stated that "[o]ur attention has been called to no decision of this court attempting to lay down an all-inclusive definition or specification of what constitutes a religious purpose." *Scripture Press Foundation v. Annunzio* (1953), 414 Ill. 339, 352, 111 N.E.2d 519, 526.

Finally, promulgation of a precise and conclusive definition of "religious purposes" was wholly unnecessary to the court's decision in *Deutsche Gemeinde*. The court did not decide whether a particular type of activity constituted a "religious purpose." Instead, the court merely held that the affidavit submitted by the taxpayer in support of its claim of exemption was fatally defective because this supporting document contained legal conclusions only, "and did not state the

facts upon which the conclusions were based." 249 Ill. 132, 137, 94 N.E. 162, 164.

■ Since the court's definition of "religious purposes" was "casually reached by the court on an issue unrelated to the essence of the controversy ***, then it is *obiter dictum*." (*Larson v. Johnson* (1953), 1 Ill. App. 2d 36, 40, 116 N.E.2d 187, 189.) "A judicial opinion, like a judgment, must be read as applicable only to the facts involved and is an authority only for what is actually decided." (*People ex rel. Schuler v. Chapman* (1939), 370 Ill. 430, 435, 19 N.E.2d 351, 354.) *Deutsche Gemeinde*, therefore, cannot be read as containing an authoritative definition of "religious purposes."

We conclude that Illinois courts have, as have courts generally, "been quite cautious in attempting to define, for tax [and unemployment insurance] purposes, what is or is not a 'religious' activity or organization—for obvious policy and constitutional reasons." B. Hopkins, The Law of Tax-Exempt Organizations sec. 8, at 132 (3d ed. 1979): see, *e.g.*, *Scripture Press Foundation v. Annunzio* (1953), 414 Ill. 339, 111 N.E.2d 519 (examining all the facts and circumstances of the particular case in deciding whether certain activities were primarily religious). See also G. Braden and R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 438-39 (1969) (applicability of exemptions typically presents factual questions "not readily controlled by definitive standards").

■ The Director of the Department of Labor contends that his decision should be affirmed on the grounds that it is not against the manifest weight of the evidence. We recognize that "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." (Ill. Rev. Stat. 1979, ch. 110, par. 274 .) However, "it is fundamental that an erroneous construction of a statute by an administrative agency is not binding upon the courts." *Winakor v. Annunzio* (1951), 409 Ill. 236, 248, 99 N.E.2d 191, 197 (administrative review of a decision by the Director of the Department of Labor in a proceeding under the Unemployment Insurance Act). See also Supreme Court Rule 366(b)(1)(i) (73 Ill. 2d R. 366(b)(l)(i)) ("Any error of law affecting the judgment or order appealed from may be brought up for review.").

■ The erroneously limited definition of "religious purposes" used by the Director in evaluating the Society's activities improperly gave short shrift to such things as the Society's covenants with the church groups, and the Society's programs for developing and maintaining congregations as members of the United Church of Christ. Consequently, we conclude that this error of law affected the Direc-

tor's deliberations.

The Director, however, correctly points that the requirements of section 211.3(A)(2) are conjunctive, and the error in interpreting "religious purposes" is not reversible if there was no error in finding that the Society was not "operated, supervised [or] controlled *** by a church or convention or association of churches."

### III. *Operated, Supervised, or Controlled*

The Director concluded that even if "in fact" the "church representatives" chosen by the member congregations of the Chicago Metropolitan Association operated, supervised, or controlled the Society, the Society was not eligible for the exemption because its "constitution," bylaws, and covenants did not "in law" give the Association or its member churches the right to exercise power over the Society.

At one time, the Unemployment Insurance Act (then known as the Unemployment Compensation Act) exempted groups that were *organized and operated* primarily for religious purposes. (Ill. Rev. Stat. 1951, ch. 48, par. 331.) Under this provision, the courts were required to examine the charter and bylaws of purportedly exempt organizations, as well as their actual operations. See, *e.g.*, *Scripture Press Foundation v. Annunzio* (1953), 414 Ill. 339, 348-49, 111 N.E.2d 519, 524.

In contrast, section 211.3(A)(2) does not provide that an exempt organization must be *organized* as well as operated, supervised, or controlled by a church or group of churches. We are therefore persuaded the General Assembly intended that an organization which is operated primarily for religious purposes would qualify for an exemption under section 211.3(A)(2) if it is *in fact* operated, supervised, or controlled by a church or group of churches. Accord, *Employment Division v. Northwest Christian College* (1977), 31 Or. App. 201, 570 P.2d 100 (construing an identical exemption).

■ Again, it is clear that the Director's erroneous interpretation of the statute affected his deliberations. We therefore conclude that we must reverse the Director's decision and remand for further administrative proceedings.

### IV. *Operated Primarily for Religious Purposes*

Although the courts and the legislature have not attempted to conclusively define "religious purposes," we are able to offer some guidance on what the legislature intended in using the phrase "operated primarily for religious purposes."

As we stated in section I of this opinion, our decision is based on

our interpretation of the Illinois exemption rather than upon the identically worded Federal provision. Nevertheless, "[w]hile our Unemployment Compensation Act is not circumscribed by the Federal act, weight should be given to the interpretation of identical provisions as made by the Federal department, for the Federal act is undoubtedly the background of all the State Unemployment Compensation Acts." *Commonwealth Life & Accident Insurance Co. v. Board of Review* (1953), 414 Ill. 475, 481, 111 N.E.2d 345, 348.

When attempting to ascertain the intent of the legislature as part of the process of statutory interpretation, it is proper to examine the report of the legislative committee which drafted the law. (*People v. Touhy* (1964), 31 Ill. 2d 236, 239, 201 N.E.2d 425, 427.) "As to those parts of the bill which the legislature passed without change as introduced by the committee, it is reasonable to assume that the legislature adopted as its intent, the intent of the committee." 2A Sutherland, Statutory Construction sec. 48.06, at 203 (4th ed. 1973).

We conclude that because of the close causal association between FUTA and the Illinois Unemployment Insurance Act, it is proper to examine congressional committee reports as an aid in interpreting Illinois provisions which are identical to sections in the Federal law. Accord, *H. Duys & Co. v. Tone* (1939), 125 Conn. 300, 304, 5 A.2d 23, 25.

The report of the House Ways and Means Committee on the Employment Security Amendments of 1970 states, in its explanation of the newly created section 3309(b)(1), that,

"This paragraph excludes services of persons where the employer is a church or convention or association of churches, but does not exclude certain services performed for an organization which may be religious in orientation unless it is operated primarily for religious purposes and is operated, supervised, controlled, or principally supported by a church (or convention or association of churches). Thus, the services of the janitor of a church would be excluded, but services of a janitor for a separately incorporated college, although it may be church related, would be covered. A college devoted primarily to preparing students for the ministry would be exempt, as would a novitiate or a house of study training candidates to become members of religious orders. On the other hand, a church related (separately incorporated) charitable organization (such as, for example, an orphanage or a home for the aged) would not be considered under this paragraph to be operated primarily for religious purposes." H.R. Rep. No. 91-612, p. 44 (1969). See also S. Rep.

No. 91-752, pp. 48-49 (1970) (containing an identical statement).

It is reasonable to assume that the Illinois General Assembly relied upon this discussion of the 1970 FUTA amendments when it enacted the corresponding State legislation. We recognize that it might sometimes be difficult to determine whether a separately incorporated entity is merely a "church related" charity rather than an organization which is "operated primarily for religious purposes." But we expect that the Director will undertake his fact-finding function with thorough consideration for the important policy and constitutional imperatives which caused the legislature to enact sections 211.3(A) and (B) (Ill. Rev. Stat. 1979, ch. 48, pars. 321.3(A) and (B)).

For the preceding reasons, the judgment of the circuit court and the decision of the Director of the Department of Labor are reversed, and this cause is remanded to the Director for proceedings consistent with this opinion. Supreme Court Rule 366(a)(5) (73 Ill. 2d R. 366(a)(5)).

Circuit court reversed; Director of Department of Labor reversed; and cause remanded with directions.

SULLIVAN, P. J., and MEJDA, J., concur.