THE GOOD SAMARITAN HOME OF QUINCY, Plaintiff-Appellee, v. THE DEPARTMENT OF REVENUE, Defendant-Appellant.

Fourth District   No. 4—84—0508

Opinion filed February 20, 1985.

Neil F. Hartigan, Attorney General, of Springfield (Jill Wine-Banks, Solicitor General, and Imelda R. Terrazino, Assistant Attorney General, both of Chicago, of counsel), for appellant.

William G. Keller, Jr., of Schmiedeskamp, Robertson, Neu & Mitchell, of Quincy, for appellee.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

On August 13, 1982, the Adams County Board of Review (Board) denied a petition filed by plaintiff, the Good Samaritan Home of Quincy (Home), an Illinois not-for-profit corporation, requesting a charitable tax exemption for certain of its real property for the year 1982. Following an administrative proceeding, defendant, Illinois Department of Revenue (Department), entered a decision on August 16, 1983, which also denied the tax exemption. On administrative review in the circuit court of Adams County, that court entered a judgment on June 8, 1984, finding that the Department's decision was contrary to the manifest weight of the evidence and reversing the denial of the tax exemption. The Department has appealed. We reverse the circuit court's judgment and uphold the Department's decision to deny the tax exemption.

The record of the administrative proceedings in this case contains the following information. The Home's corporate purpose, as stated in its bylaws, is:

"[E]xclusively for the religious, charitable, benevolent and elee-mosynary care for aged people without regard to poverty or riches of the recipient of the service provided, including the establishment, support and maintenance of a home or homes and related facilities for the appropriate care of such aged persons."

The Home operates a nursing home and related facilities in Quincy for the care of aged persons. During 1982, the main building, which is the nursing home, was licensed by the Illinois Department of Public Health for 105 sheltered care beds and 102 intermediate care beds. The portion of the property on which the main building is located has been exempted for property tax purposes and is not at issue in this case.

The Home also operates a cottage program which provides a total of 90 units of living area for couples or individuals. Six cottages, consisting of 30 apartment units, were constructed prior to 1976, and 12 apartment units were constructed in 1976. Construction of an additional 48 units was begun in 1980 and was completed in 1982. The cottages are adjacent to, but separate from, the main facility

The cottage apartments are constructed by the Home and are rented by individual residents. Construction costs range from $36,000 to $58,000, depending on the size and design of the apartment. The Home finances the construction of the cottages by charging a prospective resident the full construction cost of the cottage on a prepaid

rent basis. The prepaid cost of construction is then written down month-by-month by the amount of monthly rental charged for that type of unit. For example, if the construction cost of a particular unit is $40,000, the resident pays that amount to the Home. If the monthly rental for that unit is $320 per month, that amount is subtracted each month from the prepaid rent of $40,000. If the resident dies or moves out, the unused balance is refunded and the next resident must deposit the remaining unpaid cost of construction. After the cost of construction is recovered for a unit, the unit is rented on a monthly basis with no prepayment.

The monthly rent for the cottage apartments varies with size and design. A one-bedroom apartment is $260; a two-bedroom apartment is $320; and a two-bedroom apartment with a garage is $340. The rate of monthly rental is subject to increase by Board action whether the rent is charged against prepayment or not.

A potential cottage resident signs a residential contract prior to construction of a cottage which provides for the amount of down payment required upon signing the agreement and the subsequent payment of the construction cost balance. The contract signed by potential cottage residents also provides that the Home can dismiss a resident any time any provision of the agreement is not performed or if, in the opinion of the Home, a resident is not able to maintain himself properly in the apartment.

The cottage apartments remain the Home's property throughout a renter's occupancy. The cottage resident never owns his or her cottage or the real estate upon which the cottage is located. The cottage resident never has any equity in the cottage itself, but simply has the right to a recovery of the portion of the prepaid rent which has not been fully accrued prior to the resident's vacating of the cottage or death.

All potential cottage residents must fill out an application as do persons seeking admission to the nursing home. The names of those seeking to reside in the cottages are placed on a separate waiting list from those seeking intermediate or sheltered care in the nursing home. Potential cottage residents have the option of being put on a waiting list for one of the units where there is no equity remaining and which require no prepaid rent, on a list for a new unit, or on a list to pay off the remaining equity on a unit. As of January 1, 1982, there were 30 apartment units that had no prepayment requirement, while 60 apartments still have a prepaid rent requirement.

Following the administrative proceeding, the Department's hearing officer recommended that the tax exemption for the cottages be

denied. In support of this recommendation, the hearing officer found that the Home (1) does not dispense charity to all who need and apply for it; (2) places obstacles in the way of those seeking benefits; and (3) did not use the property in question for primarily charitable purposes during 1982. The Department then adopted the hearing officer's recommended decision. The Department maintains on appeal that the circuit court erred in reversing the Department's decision because that decision was not contrary to the manifest weight of the evidence. We agree.

Article IX, section 6, of the Illinois Constitution of 1970 provides, in pertinent part:

> "The General Assembly by law may exempt from taxation only *** property used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes ***." Ill. Const. 1970, art. IX sec. 6.

Section 19.7 of the Revenue Act of 1939 (Ill. Rev. Stat. 1981, ch. 120, par. 500.7), prior to an amendment effective September 24, 1983, exempted the following property from taxation:

> "All property of institutions of public charity, all property of beneficent and charitable organizations, whether incorporated in this or any other state of the United States, all property of old people's homes, when such property is actually and exclusively used for such charitable or beneficent purposes, and not leased or otherwise used with a view to profit; and all free public libraries." Ill. Rev. Stat. 1981, ch. 120, par. 500.7.

In order to be entitled to a real property tax exemption in this case, the Home had to prove that the property was (1) owned by a charitable organization, and (2) used exclusively for charitable purposes. The parties in this case agree that the Home is a charitable organization. The remaining issue then is whether the Home's property on which the cottages are located is exclusively used for charitable purposes.

■ In *Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 233 N.E.2d 537, the supreme court established the following guidelines for determining whether the use of property is in fact exclusively for charitable purposes: (1) The benefits derived are for an indefinite number of persons; (2) the organization has no capital, capital stock or shareholders, and does not profit from the enterprise; (3) funds are derived mainly from private and public charity, and the funds are held in trust for the objects and purposes expressed in the charter; (4) the charity is dispensed to all who need and apply for it; (5) no obstacles appear to be placed in the way of those seeking the

benefits; and (6) the exclusive (primary) use of the property is for charitable purposes. 39 Ill. 2d 149, 157, 233 N.E.2d 537, 541-42.

■ The parties present at least some argument as to the applicability of each of the six factors contained in *Korzen*. The Home maintains that the Department has waived its right to argue on appeal that the Home failed to present adequate proof concerning the third, fourth, and sixth factors because the Department failed to mention these factors during oral argument in the circuit court. No transcript of the oral arguments in the circuit court is contained in the record on appeal. However, we note that the Department's brief submitted to the circuit court contains arguments as to each of the six *Korzen* factors. Accordingly, we conclude that the question of the applicability of each of the six factors to the case at bar has been properly presented for review.

We note that (1) because the terms of article IX of the Illinois Constitution subject all property generally to taxation, courts of review must strictly construe statutes granting tax exemptions and require that such statutes keep clearly within the boundaries set forth in the Constitution; (2) the burden of proving the right to an exemption is upon the party seeking it; and (3) in determining whether property is included within the scope of an exemption, all facts are to be construed, and all debatable questions resolved, in favor of taxation. *Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 233 N.E.2d 537.

■ After carefully considering the record and the foregoing legal principles, we conclude that sufficient evidence was introduced to support the hearing officer's findings and the Department's decision to deny the Home's request for a tax exemption.

The record indicates that after a person seeking to live in the cottage apartments fills out an application, that person's name is placed on a waiting list for either a new unit, a unit with no prepayment requirement, or a unit with a prepayment requirement. Construction costs vary from $36,000 to $58,000, and, at the time of the hearing, only 30 of the 90 units had no prepayment requirement.

The Home points out that tax exemptions have been consistently denied to institutions which require the initial payment of a substantial, nonrefundable "founder's fee." (See *Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 233 N.E.2d 537; *Plymouth Place, Inc. v. Tully* (1977), 54 Ill. App. 3d 657, 370 N.E.2d 56.) The Home argues that its plan may be distinguished from the "founder's fee" requirements because the unused balance of the "prepaid rent" is refundable if a resident terminates occupancy of the cottage apartments.

The Home's argument ignores the fact that residents of the cottages with prepaid rent requirements must not only be able to initially afford the prepayment of rent, which is substantially more than many of the "founder's fees," but also will not have the financial use of the sums of "prepaid rent." In addition, old-people's homes which do not require an entrance fee have been denied tax exemptions. (See *Small v. Pangle* (1975), 60 Ill. 2d 510, 328 N.E.2d 285.) We conclude that the fact that most applicants are required to pay a substantial amount of "prepaid rent" clearly represents an obstacle to the receipt of the benefits offered by the Home.

The record further indicates that a person who does not have the money to pay the construction cost, or whatever prepayment amount that remains, will not be considered for one of those apartments and will be limited to one of the cottages that does not have a prepayment requirement. The Home did not present any evidence that a person who had been unable to pay, or who was on public aid, had ever lived in the cottage apartments. Accordingly, we conclude that the Home does not dispense aid to those who need and apply for it.

The record indicates that the primary purpose of the cottage apartments is to provide living quarters for residents. The apartments are primarily used as residential lodging for those individuals fortunate enough to be able to afford the financing of their construction and for the monthly rental requirements. Although the apartments are pleasant and benefit those who reside in them, they are merely a convenient way for elderly people to feel secure and live in an environment that satisfies their needs according to their ability to pay. If they do not pay, their residency may be terminated. There is no provision mandating that any charity be dispensed to individuals who do not pay or to any destitute member of society in general. The incidental benefit accruing to the public is no different from that associated with almost any lawful housing endeavor. Accordingly, we conclude that the primary use of the property in question is not for charitable purposes.

The Department's decision to deny the Home a tax exemption was not contrary to the manifest weight of the evidence.

For the reasons stated herein, we reverse the circuit court's judgment and affirm the Department's decision to deny a tax exemption.

Reversed.

MILLS and McCULLOUGH, JJ., concur.