FAIRVIEW HAVEN, Plaintiff-Appellee, v. THE DEPARTMENT OF REVENUE et al., Defendants-Appellants.

Fourth District  No. 4—86—0464

Opinion filed March 25, 1987.

LUND, J., concurring in part and dissenting in part.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Kathryn A. Spalding and Eddie Santiago, Assistant Attorneys General, of Chicago, of counsel), for appellants.

Harvey S. Traub, of Harvey S. Traub Ltd., of Fairbury, and John J. Durso, of Katten, Muchin, Zavis, Pearl, Greenberger & Galler, of Chicago, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

The Illinois Department of Revenue (Department) denied Fairview Haven's (Fairview) real estate tax exemption request for the 1982 tax year. Fairview filed a petition for administrative review. The circuit court reversed, finding the Department's determination was contrary to the manifest weight of the evidence. The Department appeals, arguing the circuit court erred in reversing because its determination as to the noncharitable and nonreligious use of the property was supported by the evidence, no first amendment rights are infringed upon, and the circuit court erred in determining Fairview exempt for all subsequent years.

We affirm in part, reverse in part, and remand.

Fairview is a not-for-profit corporation, organized and supported by four Apostolic Christian Church of America congregations. The amended articles of incorporation state that the purpose for which the corporation is organized is religious, charitable, and the care and keeping of elderly people. The corporation's purposes also note that nonpay and part-pay residents will be accepted to the extent that the financial ability of the corporation is not jeopardized. Board members and corporate officers are members of the founding congregations. They are elected by those congregations during regular church elections. Fairview has no capital, capital stock or shareholders, and does not profit from its operation. The board of directors reports to the founding churches, and indirectly to the national church. It opened in 1962. Until the 1982 tax year, Fairview had been ruled tax exempt.

The facility is a single-story building containing 38,000 square feet. Approximately 16,500 square feet of the facility contain 16 independent-living units, which are apartment-like units. Residents in the units must be self-sufficient. The remainder of the building contains a State-licensed intermediate-care facility. In 1982, Fairview had 49 residents in its intermediate-care facility. This facility contained 38 rooms, 9 of which were semiprivate rooms. A monthly fee of $1,060 was charged for a single room. Persons occupying double rooms paid $880 per month. If a resident could not afford the rate, he paid less. Rates were adjusted to the resident's ability to pay. Public aid recipients resided in the intermediate-care portion of Fairview. These residents were not necessarily placed in double rooms.

The admission contract between Fairview and its intermediate-care patients required applicants to pay a $300 nonrefundable fee in 1982. The contract also contained a guarantee-of-payment clause and a provision that residents could be discharged for failure to pay. No one had been discharged for this reason. Wayne Drayer, Fairview's admin-

istrator, thought this provision was required by law. The board of directors (board) would only consider discharging a person if he had sufficient funds and refused to pay.

Drayer testified that the rates for intermediate care are determined by how much money is needed to cover the cost of care. Any extra money is used to enlarge services. If money is needed for capital expenses, the churches raise and contribute it. The churches contributed the funds to add a laundry room and build the independent-living units. The churches also subsidize residents who cannot meet monthly fees. Monthly fees are due on the first of the month. They vary according to whether the rooms are private or semiprivate.

Drayer further testified that the board had decided to delete the discharge-for-failure-to-pay clause from its contract with its residents. The board had also decided to delete the guarantee clause. The $300 application fee had been eliminated, residents had been notified of its deletion, and the fee had been returned to those who had paid it in 1982. Drayer stated that the fee, when charged, had been waived when necessary. The first year that Fairview admitted applicants who were already receiving public aid was in 1983. There were three public aid recipients in Fairview in 1982. All had started receiving public aid after admission.

Fairview's policies do not require it to accept or reject public aid recipients. However, Fairview accepts applicants who need care regardless of their ability to pay. It accepts public aid recipients in its intermediate-care facility.

The wing containing the 16 independent-living units is connected to the main building by a hallway. Five of the apartments are leased to the residents on a rental basis. The other 11 units are occupied on a purchase basis. This payment is split between a life-lease and a no-interest loan. The loan is returned to the resident's estate or the resident upon termination of occupancy. The life-lease is prorated over five years. The portion of the lump-sum payment allocated between the loan and the lease is dependent upon the resident's life expectancy. The loan money is pooled for greater financial earning capacity.

The monthly rent on the five rental independent-living units was $225 in 1982. All residents paid the full amount. The 11 newer units cost $34,500 for a single bedroom and $42,500 for a double bedroom. The entire purchase amount must be paid prior to occupancy. All 11 units were in use during the final six months of 1982. The monthly fees were calculated to cover costs. Space in the independent-living units is limited to members of the Apostolic Christian faith and friends, 65 years old or older, who were able to pay the admission fees.

On two occasions, applicants did not have sufficient funds to pay the full entrance fee to the independent-living units. Members of the founding congregations contributed the needed funds. Residents in the independent-living units have priority access to the intermediate-care facility and are guaranteed lifetime care. The units have a call button which rings at the nurses' station for emergencies. Residents may also have their blood pressure checked at the nursing facility. However, residents of the independent-living units employ their own physicians. Laundry facilities are made available to them, and they can purchase meals. The units all have individual entrances and are set up on an apartment-like basis. Drayer stated that the independent-living units comprise approximately 25% of the total area occupied by Fairview.

Several witnesses testified about the relationship of Fairview to the Apostolic Christian Church of America. Stephen Rinkenberger, a church elder, testified that the Fairbury, Forrest Park, Cissna Park, and Bradley congregations of the Apostolic Christian Church of America founded Fairview. There was a need in the community to care for the elderly in a non-warehouse fashion and be a source of Christian atmosphere. One of the basic tenets of the church is that salvation is accomplished through faith and Christian witness. Therefore, everyone has a duty to preach the gospel and do Christian service works. The church tries to create avenues through which members can show their faith by accomplishing Christian service works. Fairview exists to meet the above goal, and the motivating factor behind Fairview's operation is to provide an opportunity to help the elderly and fulfill the tenets of the Apostolic Christian Church. Fairview is listed as an outreach ministry of the national church.

Ruben Huber, a member of Fairview's board, testified that church members raised the funds to construct Fairview and many volunteers worked on the construction of the building. Many volunteers from the local congregations worked at Fairview. Only church members may be on Fairview's board. All policies, rules, and regulations of Fairview must subscribe to the beliefs of the church and be reflected in the operation of the nursing home. Fairview is situated on property adjacent to the Fairbury Apostolic Christian Church. Religious services are piped into residents' rooms, and the background music consists of religious themes. The Internal Revenue Service lists Fairview as exempt. Huber further stated that Fairview was an integral part of the church, governed by the church, and maintained by it. It proclaimed the good news, so served a religious purpose.

Drayer stated Fairview implements the church's ministry by tying preaching to action. Sixty percent of the residents are members of the

church. Approximately 40% of the employees are members of the church. Nonmembers may work at Fairview, but they must abide by the doctrines of the faith. Elders are available to counsel residents and their families, the maintenance man is a lay minister, prayers are conducted before meals, Bible study is available, payroll checks contain religious messages, and residents, family members, and employees have been converted to the faith. Over 120 persons volunteer at Fairview. Christian service work is mandated by scripture.

The Department denied the application for exemption. It adopted the hearing officer's findings. The hearing officer found that Fairview had no capital, stock, or shareholders, had a policy of requiring full payment prior to entry into the independent-living units, and had a policy of nonadmission to public aid recipients in 1982. The policies were obstacles in the way of charity being dispensed to all. Any charity came from the supporting churches and not Fairview. Therefore, the Department concluded that Fairview's use in 1982 was primarily commercial, not religious or charitable.

The circuit court reversed the Department's findings on administrative review. It noted that the decision was contrary to the manifest weight of the evidence and, as a matter of law, the Department's finding that Fairview was not used exclusively for religious purposes violated its first amendment rights. The circuit court declared Fairview exempt from taxation for 1982 and all subsequent years.

Initially, the Department argues that Fairview is not entitled to a charitable-use exemption for the 1982 tax year because of its policy of requiring application fees, its contract, policy of not accepting public aid recipients, and fiscal requirements related to the independent-living units. It characterizes these matters as obstacles which prevented charity in the form of nursing services from being dispensed at all. The Department also maintains that the fiscal policies are evidence that Fairview was run on a commercial, not charitable basis. Therefore, the Department maintains that its decision to deny a charitable-use exemption was supported by the manifest weight of the evidence.

Fairview argues that under the facts of this cause, there are no obstacles which preclude charity from being dispensed to all.

The findings and conclusions of an administrative agency on questions of fact are considered *prima facie* true and correct. (Ill. Rev. Stat. 1985, ch. 110, par. 3—110.) A court may not interfere with the discretionary authority vested in an administrative body unless that authority is exercised in an arbitrary manner or the decision is against the manifest weight of the evidence. A reviewing court may not reweigh the evidence. (*Murdy v. Edgar* (1984), 103 Ill. 2d 384, 469

N.E.2d 1085.) The agency's decision is contrary to the manifest weight of the evidence only when no rational trier of fact, viewing the evidence in a light most favorable to the agency, could have agreed with the agency's decision. (*Agans v. Edgar* (1986), 142 Ill. App. 3d 1087, 1094, 492 N.E.2d 929, 933-34.) With these principles in mind, we turn to the applicable constitutional and statutory provisions.

Article IX of the Illinois Constitution provides that the General Assembly may exempt all property used exclusively for religious and charitable purposes. (Ill. Const. 1970, art. IX, sec. 6.) Section 19.7 of the Revenue Act of 1939 states:

> "All property of institutions of public charity, all property of beneficent and charitable organizations, \*\*\* and all property of old people's homes, when such property is actually and exclusively used for such charitable or beneficent purposes, and not leased or otherwise used with a view to profit" (Ill. Rev. Stat. 1981, ch. 120, par. 500.7) "is exempt from taxation" (Ill. Rev. Stat. 1981, ch. 120, par. 500).

Statutes granting real estate tax exemptions are strictly construed in favor of taxation. (*Coyne Electrical School v. Paschen* (1957), 12 Ill. 2d 387, 390, 146 N.E.2d 73, 79.) The party claiming the exemption must prove by clear and convincing evidence that it falls within the constitutional authorization and the terms of the statute under which it claims exemption. (*Board of Certified Safety Professionals v. Johnson* (1986), 112 Ill. 2d 542, 547, 494 N.E.2d 485, 488.) Individual claims for tax exemption are to be determined from the facts presented by the cause. (*MacMurray College v. Wright* (1967), 38 Ill. 2d 272, 278, 230 N.E.2d 846; *Coyne Electrical School v. Paschen* (1957), 12 Ill. 2d 387, 146 N.E.2d 73.) To quality for an exemption from taxation as a charity, the petitioner must show ownership by a charitable or qualified entity (Ill. Rev. Stat. 1981, ch. 120, par. 500.7) and exclusive use for charitable purposes (*Coyne Electrical School v. Paschen* (1957), 12 Ill. 2d 387, 388, 146 N.E.2d 73). In the instant case, the only issue was whether Fairview was exclusively used for charitable purposes.

In *Methodist Old People's Home v. Korzen* (1968), 39 Ill. 2d 149, 157, 233 N.E.2d 537, 541-42, the court set forth the fundamental guidelines for determining if property is in fact being used for charitable purposes. A charitable use exists when: (1) the benefits derived from the nursing home are for an indefinite number of persons; (2) the nursing home is not for profit; (3) its funds are derived from public or private charity and held in trust for the purposes stated in its charter; (4) charity is dispensed to all who need and apply for it; (5) no obstacles appear to be placed in the way of those seeking benefits; and (6)

the primary, exclusive use of the property is to carry out charitable purposes. The fact that the plaintiff charges fees to those who are not poverty stricken does not destroy a charitable use.

In *Korzen*, the court found that the health requirements, monthly fees, the fact that plaintiff charged fees according to the desirability of the living space, and founders' fees indicated a lack of charitable purpose. These factors also restricted plaintiff from providing services to all who needed and sought its benefits. See *Board of Certified Safety Professionals v. Johnson* (1986), 112 Ill. 2d 542, 546, 494 N.E.2d 485; *Good Samaritan Home v. Department of Revenue* (1985), 130 Ill. App. 3d 1036, 1039-40, 474 N.E.2d 1387, 1390.

■ Where property is used for two purposes, one of which is exempt from taxation and one of which is not exempt, a tax should be imposed against the part of the property which does not qualify for exemption. (*City of Lawrenceville v. Maxwell* (1955), 6 Ill. 2d 42, 49, 126 N.E.2d 671, 676.) With this principle in mind, the two types of facilities at Fairview need to be considered.

■ The obstacles utilized by the Department in finding the intermediate-care facility did not qualify for a charitable-use exemption were essentially the contract provisions requiring a guarantor, providing for discharge for nonpayment, and providing for a $300 application fee. Testimony established that the guarantor and discharge clauses had never been utilized. Medicaid recipients resided in the intermediate-care facility. The application fee was eliminated, partially refunded, and waived when necessary. Some residents who became unable to pay monthly fees had been in fact assisted by Fairview, its church founders, individuals, and others. Room assignment did not depend upon ability to pay. The intermediate-care facility, thus, met the requirements of *Korzen*, and the decision to deny the charitable exemption as to that portion of the facility was contrary to the manifest weight of the evidence.

The independent-living units, however, pose a different situation. The situation presented in *Good Samaritan* is somewhat analogous to that presented by the independent-living units in the instant case. We are persuaded by the reasoning in *Good Samaritan*. The taxpayer in *Good Samaritan* was a nursing home which had cottages for the elderly on the same property. The main nursing facility was exempt. Its exemption was not in issue on appeal. The court held that the cottages were not exempt and the Department's ruling as to them was supported by the manifest weight of the evidence. The residents in *Good Samaritan* had to pay the construction costs of the cottages prior to entry. The rental value was then subtracted on a monthly basis from

the prepaid cost. The unused prepaid rent was refundable.

Here, the fee for the independent-living units is split between a life-lease and a no-interest loan. The lease is prorated. The loan is refundable. Residents are, however, deprived of the use and the income earning ability of the loan portion. They do not accrue equity in the units. This fee is an obstacle in the way of receipt of benefits provided by the home. Additionally, residence in the independent-living units is restricted to members of the faith and friends. Therefore, by definition, benefits of the independent-living units are not applied to all. Fairview argues that in fact in two cases, members of its founding congregations have partially funded people who applied for the independent-living units but did not have sufficient funds for the prepayment. Therefore, it maintains that the fees are not an obstacle. However, there is no guarantee that such funding would be available nor does the fact that a separate corporate entity or person may voluntarily help an applicant alleviate the fact that the applicants are expected to have sufficient funds. Additionally, nowhere in the corporate charter is the corporation required to accept those who do not have sufficient funds to pay for their care.

On the basis of the reasoning contained within *Korzen, People ex rel. Nordlund v. Association of the Winnebago Home for the Aged* (1968), 40 Ill. 2d 91, 99, 237 N.E.2d 533, 538, and *Good Samaritan*, the denial by the Department of the charitable-use exemption for the independent-living units was supported by the manifest weight of the evidence. *Agans v. Edgar* (1986), 142 Ill. App. 3d 1087, 1094, 492 N.E.2d 929, 933-34.

The Department next argues that its decision denying Fairview a religious-use exemption was supported by the manifest weight of the evidence and that its inquiry into the use of the property was not precluded by constitutional principles. Fairview argues, in essence, that the Department's rejection of its characterization of its beliefs and activities as religious violated its constitutional right to freedom of religion. Second, it argues the Department's determination was contrary to the manifest weight of the evidence.

The first amendment of the United States Constitution (U.S. Const., amend. I) and article I of the Illinois Constitution (Ill. Const. 1970, art. I, sec. 3), provide that governmental entities may not inhibit the free exercise of religion or act in such a way as to foster any particular belief. Therefore, governmental bodies are precluded from resolving disputes on the basis of religious doctrine (*Grace Evangelical Lutheran Church v. Lutheran Church-Missouri Synod* (1983), 118 Ill. App. 3d 151, 454 N.E.2d 1083) and must respect the internal auton-

omy of religious organizations (*Lowe v. First Presbyterian Church* (1974), 56 Ill. 2d 404, 308 N.E.2d 801). In the tax context, the first amendment requires the court to accept the entity's characterization of its activities and beliefs as religious as long as the characterization is in good faith. *Holy Spirit Association for the Unification of World Christianity v. Tax Com.* (1982), 55 N.Y.2d 512, 518, 450 N.Y.S.2d 292, 293, 435 N.E.2d 662, 663.

In *Holy Spirit*, the New York Court of Appeals stated:

> "When, as here, particular purposes and activities of a religious organization are claimed to be other than religious, the civil authorities may engage in but two inquiries: Does the religious organization assert that the challenged purposes and activities are religious, and is that assertion bona fide? Neither the courts nor the administrative agencies *** may go behind the declared content of religious beliefs any more than they may examine into their validity." (55 N.Y.2d 512, 521, 450 N.Y.S.2d 292, 295, 435 N.E.2d 662, 665.)

The court then remanded for a factual determination of whether the use of the property complied with the stated purpose.

■■■ No cases in Illinois have directly addressed the issue of the constitutional parameters of the religious-use inquiry in tax matters. However, the format set forth in *Holy Spirit* is persuasive and has been followed. First, the court must accept the organization's characterization of the purpose of its activities and, second, determine whether the property is in fact exclusively used for the religious purposes. See *McKenzie v. Johnson* (1983), 98 Ill. 2d 87, 456 N.E.2d 73; *Scripture Press Foundation v. Annunzio* (1953), 414 Ill. 339, 111 N.E.2d 519.

■■■ In the instant case, the Department did not reject Fairview's characterization of the beliefs of the Apostolic Christian Church nor did it assess the doctrinal structure of that church. It did not reject Fairview's contention that part of its use was for religious purposes. However, it found that the primary use, rather than being religious, was commercial in nature. Inquiry into the primary use to which property is in fact put under the facts presented in this case does not necessarily violate a party's first amendment rights, as it neither assesses the inherent validity of the belief structure nor determines whether the particular conduct conforms to the standards or purposes of a religious group. (See generally *McKenzie v. Johnson* (1983), 98 Ill. 2d 87, 456 N.E.2d 73; *Baumgartner v. First Church of Christ, Scientist* (1986), 141 Ill. App. 3d 898, 904-05, 490 N.E.2d 1319, 1323-24.) Inquiry into the use to which the property was put is not precluded by consti-

tutional principles.

Section 19.2 of the Revenue Act of 1939 exempts "[a]ll property used exclusively for religious purposes, *** and not leased or otherwise used with a view to profit" from taxation. (Ill. Rev. Stat. 1981, ch. 120, par. 500.2.) There is no all-inclusive definition of religious purpose for tax cases. (*Scripture Press Foundation v. Annunzio* (1953), 414 Ill. 339, 352, 111 N.E.2d 519; *Community Renewal Society v. Department of Labor* (1982), 108 Ill. App. 3d 773, 779, 439 N.E.2d 975.) Whether an entity has been organized and operated exclusively for religious purposes is determined from its charter, bylaws, and actual method and facts relating to its operation. *Scripture Press Foundation v. Annunzio* (1953), 414 Ill. 339, 349, 111 N.E.2d 519.

In *McKenzie v. Johnson* (1983), 98 Ill. 2d 87, 98-99, 456 N.E.2d 73, 78-79, the court held that section 19.2 of the Revenue Act of 1939 was constitutional as it applied to parsonages. It rejected past narrow interpretations of religious use and cited with favor language which stated that if a property is used for purposes which are reasonably necessary for the exempt objective, it is exempt. (See also *Northwestern Memorial Foundation v. Johnson* (1986), 141 Ill. App. 3d 309, 490 N.E.2d 161; *Evangelical Teacher Training Association v. Novak* (1983), 118 Ill. App. 3d 21, 454 N.E.2d 836.) An incidental secular use will not destroy a religious-use exemption if the primary use of the property is to further religious goals. *McKenzie v. Johnson* (1983), 98 Ill. 2d 87, 96, 456 N.E.2d 73; *Evangelical Teacher Training Association v. Novak* (1983), 118 Ill. App. 3d 21, 26, 454 N.E.2d 856.

Here it is not contested that the operation of Fairview provided an opportunity for members of the Apostolic Christian faith to carry out Christian service work, care for the elderly, and engage in evangelization. However, operation of the nursing home was not necessary for these religious purposes, which could also have been accomplished through other means. (See generally *Yakima First Baptist Homes, Inc. v. Gray* (1973), 82 Wash. 2d 295, 510 P.2d 243; *Christian Retirement Homes, Inc. v. Board of Equalization* (1970), 186 Neb. 11, 180 N.W.2d 136.) In *Yakima* the taxpayer argued that care of the aged was a religious purpose. The court noted that the practice of charity, kindness to other persons and in particular to the aged, and the practice of all virtues are encouraged by religious organizations; however, it cannot be stated that they are religious purposes within commonly accepted definitions of the word.

The same analytical framework as is applied to charitable-use exemptions is applied in determining religious-use exemptions. (*Scripture Press Foundation v. Annunzio* (1953), 414 Ill. 339, 349, 111

N.E.2d 519; *Evangelical Teacher Training Association v. Novak* (1983), 118 Ill. App. 3d 21, 454 N.E.2d 836.) It is not contested that Fairview operated as a not-for-profit business with a contract, requirements for residency, provisions for payment, and provisions for discharge. The corporate purpose included the care and keeping of the elderly. Fairview's method of operation was businesslike. The Department's determination based upon the actual method of operation that Fairview was not exempt for religious purposes was supported by the evidence. *Scripture Press Foundation v. Annunzio* (1953), 414 Ill. 339, 349, 111 N.E.2d 519; *Agans v. Edgar* (1986), 142 Ill. App. 3d 1087, 1094, 492 N.E.2d 929, 933-34.

■■■ The Department next argues that the circuit court erred in ruling Fairview exempt from future taxation. We agree. An adjudication of tax status in one year has no *res judicata* effect in a subsequent year. Thus, a taxpayer may be required to relitigate the issue of its entitlement to an exemption on an annual basis. (*People ex rel. Tomlin v. Illinois State Bar Association* (1980), 89 Ill. App. 3d 1005, 412 N.E.2d 198.) Ultimately, the decision to deny an exemption is reviewable by the court. (*Christian Action Ministry v. Department of Local Government Affairs* (1978), 74 Ill. 2d 51, 383 N.E.2d 958.) An injunction permanently restraining the collection of real estate taxes on a purportedly exempt property is invalid even though ownership and the use of the property remain the same from tax year to tax year. (*People ex rel. Tomlin v. Illinois State Bar Association* (1980), 89 Ill. App. 3d 1009, 412 N.E.2d 198.) Here, the court, in effect, granted a permanent exemption. This is not an appropriate relief under the principles of *Christian Action Ministry* and the statute.

For the above reasons, we affirm the circuit court's finding that the intermediate-care portion of Fairview was entitled to a charitable-use exemption, reverse as to the charitable exemption for the independent-living units, reverse on all other issues posed, and remand for a determination of the portion of the facility devoted to the independent-living units and thus subject to taxation.

Affirmed in part, reversed in part, and remanded with direction.

KNECHT, J., concurs.

JUSTICE LUND, concurring in part, and dissenting in part:
I would affirm the trial court except as to future decisions by the Board of Review.
The majority decision correctly states the facts. There is one real

purpose for the operation of Fairview Haven, to provide a resident care facility, operated under the guidelines of a church order for the benefit of the elderly, regardless of financial ability. It is time we recognize that providing a home for the elderly, without a profit motive, with an administration based on religious teachings, which includes loving care for the elderly, is a charitable purpose.

There is no doubt that the elderly may not have the physical or mental abilities to adequately maintain independent living. Snow removal, home repair, lawn care, obtaining food and supplies, physical care, and cleanliness can all become great burdens. Couple the natural trauma of aging with these frustrations and you have emotional upheaval. Worry can become a constant companion. The picture outlined applies to people in all walks of life, all social levels, all economic levels, and to people of all or no religious faith. I suggest that those who doubt the existence of this turmoil have spent most of their lives in a closet.

A program holding out security and help to the aged certainly accomplishes a social interest. It certainly advances a purpose beneficial to the public. It appears to aid people and seek to improve their condition. Is not there an amelioration of persons in unfortunate circumstances? See the definition of "charity" (Black's Law Dictionary 296 (4th ed. 1968)).

Section 19.7 of the Revenue Act of 1939 (Ill. Rev. Stat. 1981, ch. 120, par. 500.7), uses the words "when such property is actually and exclusively used for charitable or beneficent purposes, and not leased or otherwise used with a view to profit."

"Charitable" is defined as "[h]aving the character or purpose of a charity." (Black's Law Dictionary 295 (4th ed. 1968).) One of the definitions of "charity" is "[a]ny scheme or effort to better the condition of society or any considerable part thereof." Black's Law Dictionary 296 (4th ed. 1968).

I find fault with an interpretation, in this case, which would in effect declare the providing of an apartment, located within a loving and concerned complex for the handicapped or elderly, to be noncharitable because the benefactor can pay for the initial cost of the space. The evidence clearly shows much more is being provided than independent-living quarters. Security, freedom from household worries, immediate assistance if needed, food service, and religious services are available, all without the presence of the profit motive.

Charity extends to more than the poor. The unfortunate include those with or without funds. One may be in need and still have sufficient clothes and a full stomach. For one who is of deep religious

devotion, he or she may be more distressed by being unable to attend church than going without food. Every bit of evidence before this court indicates that Fairview Haven, in every part of the structure, is seeking to accomplish a social benefit, which generally affects the public, without the motives of profitable gain.

It is suggested that this dissent is consistent with the decision of our supreme court in *People ex rel. Nordlund v. Association of the Winnebago Home for the Aged* (1968), 40 Ill. 2d 91, 99, 237 N.E.2d 533, 538. The overall program at Fairview Haven has been to benefit the aged. The independent housing provides for those who no longer have the ability to maintain separate homes or apartments but are not yet ready to go into a group living or nursing-care environment. The deposit is commensurate with the cost, but has been waived. *Nordlund* recognized "that charging fees and dispensing benefits to other than those who are poverty stricken does not cause an institution to lose its charitable character." 40 Ill. 2d 91, 101, 237 N.E.2d 533, 539.

It appears that Fairview Haven used its fees to support all of the residents, still showing a net loss. The record indicates that actual practice resulted in equal treatment regardless of the financial ability of the residents. The $300 admission fee had been waived but in any case was insignificant. It is not comparable to the $4,000 fee referred to in the 1968 case of *Nordlund*. The $300 fee was withdrawn when the directors became aware of the Department of Revenue's objection. It should not be criticized. It served as nothing more than an incentive to honor a commitment to move into the home.

For the reasons given, I would hold the entire properties of Fairview Haven as charitable under the provisions of section 19.7. While it is not necessary to discover the question of "religious use," I do find that the evidence is strong and compelling in favor of the appellee.