(No. 42228.—

THE PEOPLE *ex rel.* County Collector, Appellant, *vs.* HOPEDALE MEDICAL FOUNDATION, Appellee.

*Opinion filed Sept. 29, 1970.—Rehearing denied Dec. 3, 1970.*

BERNARD L. OLTMAN, State's Attorney, of Pekin, (MELVIN O. MOELE and CARL F. REARDON, of counsel,) for appellant.

JOHN E. CASSIDY, JR., of CASSIDY, CASSIDY, QUINN & LINDHOLM, of Peoria, for appellee.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

This case involves applications of the county collector of Tazewell County, for judgment and orders of sale for delinquent real-estate taxes assessed for each of the years 1962, 1963, 1964, 1965, and 1966 against the property of the defendant, the Hopedale Medical Foundation.

The Hopedale Medical Foundation, situated on 5.12 acres of land in the city of Hopedale, consisted of a hospital, a nursing home, and a medical arts building, all under one roof, and a nurses' residence and a home for the elderly known as Hopedale House, in separate buildings. It claimed that its property was exempt from taxation because it was owned and used by an Illinois not-for-profit corporation for charitable and eleemosynary purposes pursuant to section 19.7 of the Revenue Act. Ill. Rev. Stat. 1969, ch. 120, par. 500.7.

At the close of the defendant's evidence, the collector moved for judgment in his favor for each of the tax years in issue on the ground that the defendant had failed as a

matter of law to meet its burden of proving that it is a charitable organization within the meaning of section 19.7 of the Revenue Act. The court granted the collector's motion for judgment as to Hopedale House, the nurses's residence, and the 20% of the land upon which these buildings were located, but sustained the defendant's objections as to $40,771 of the $54,644 tax due, or 74.5% of the total. At the close of all the evidence, the defendant moved for judgment sustaining its objections in the amount of $40,771 and for an order directing the collector to refund that amount. The defendant argued that, in its order at the close of the defendant's evidence, the court had found as a matter of law that the defendant had sustained its burden of proving its right to an exemption as to all the property except Hopedale House, the nurses' residence, and 20% of the land, and that the evidence introduced thereafter by the collector either corroborated the defendant's proof or failed to establish any new facts that would cause the court to change its judgment.

The court entered final orders in which it found "that no gain or profit, in a private sense, has inured to the benefit of any person connected with The Hopedale Medical Foundation, an Illinois not for profit corporation." Nevertheless, it modified its order entered at the close of the defendant's evidence and granted judgment in favor of the collector as to $31,438 of the $54,644 tax due, or 57.5% of the total. It sustained the defendant's objections, in part, as follows: in 1962, the hospital and 40% of the land, for a refund of $1,806; in 1963, the hospital and 40% of the land, for a refund of $2,838; in 1964, the hospital and 40% of the land, for a refund of $2,880; in 1965, the hospital, construction in progress, and 40% of the land, for a refund of $3,937; and in 1966, the hospital, the medical arts building, and 40% of the land, for a refund of $11,745. In all, the court sustained the defendant's objections only as to $23,206 of the $54,644 tax due, or 42.5% of the total.

The collector has appealed directly to this court pursuant to our Rule 302(a)(1)) (Ill. Rev. Stat. 1969, ch. 110A, par. 302(a)(1), and prays that the lower court's final order be reversed as to the partial refund of taxes to the defendant and for a finding and order that the defendant is not entitled to any refund of taxes for the tax years involved. The defendant cross-appealed and asks this court to enter an order sustaining the lower court's order entered at the close of the defendant's evidence. No questions are raised on the pleadings.

Section 3 of article IX of the State constitution states: "The property of the state, counties, and other municipal corporations, both real and personal, and such other property as may be used *exclusively* for agricultural and horticultural societies, for school, religious, cemetery and charitable purposes, may be exempted from taxation; but such exemption shall be only by general law." (Ill. Const., art. IX, sec. 3.) (Emphasis supplied.) Section 19.7 of the Revenue Code provides that "All property of institutions of public charity, all property of beneficent and charitable organizations, whether incorporated in this or any other state of the United States, and all property of old people's homes, when such property is *actually* and *exclusively* used for such charitable or beneficent purposes, and not leased or otherwise used with a view to profit * * *" shall be exempt from taxation. Ill. Rev. Stat. 1969, ch. 120, par. 500.7 (Emphasis supplied).

We held in *Sisters of Third Order of St. Francis* v. *Board of Review*, 231 Ill. 317, 321, that a not-for-profit corporation is used exclusively for charitable purposes and is therefore exempt from taxation "so long as all the money received by it is devoted to the general purposes of the charity, and no portion of the money received by it is permitted to inure to the benefit of any private individual engaged in managing the charity." (See also *German Hospital* v. *Board of Review*, 233 Ill. 246; *People ex rel.*

*Cannon* v. *Southern Illinois Hospital Corp.*, 404 Ill. 66; *Methodist Old Peoples Home* v. *Korzen*, 39 Ill.2d 149; *People ex rel Nordlund* v. *Ass'n Winnebago Home for the Aged*, 40 Ill.2d 91.) It is not disputed that the defendant has no capital stock or shareholders, that it pays no dividends, and that its services are available to all who apply without regard to their ability to pay. The narrow issue upon which this case must turn is whether there is inurement of benefit to a private individual engaged in managing the Foundation so as to preclude a tax exemption.

From 1952 through 1955, Dr. Lawrence Rossi, a physician, practiced medicine from a principal office in Pekin, Illinois, and maintained a part-time office in Hopedale, a small community 15 or 20 miles from Pekin with a population of 550. In late 1953, he decided to close his Hopedale office because of the growth of his practice in Pekin and the impracticality of commuting to Hopedale. However, in response to requests from a group of Hopedale residents, he agreed to give up his practice in Pekin and to move to Hopedale, "if the community would provide adequate health facilities."

In the fall of 1953, Dr. Rossi and his wife acquired approximately two acres of land in Hopedale in consideration for $1,500 worth of bonds of the hospital financing program on which Dr. Rossi was the obligor. Construction of an initial 20-bed hospital began in June, 1954, under the supervision of Dr. Rossi, and was completed in May, 1955. Dr. Rossi financed the construction of the hospital by selling to people in the community, as his own personal obligation, $105,000 worth of first mortgage 4% bonds payable in ten years. Dr. Rossi also became personally indebted to the extent of $50,000 to pay for supplies and equipment for the hospital. He testified: "Since no one wanted to participate in the actual financial responsibility for construction of a hospital, I volunteered to take the debt on my shoulders, and give the local people a first mortgage on the hospital

property. This, in effect, made me owner of the hospital."
The original hospital contained office space for Dr. Rossi
from which he conducted his private practice and also func-
tioned as the director and administrator of the hospital. At
this time, he was the only resident physician in Hopedale.

In 1956, Dr. Rossi and his wife acquired the balance
of the 5.1 acre tract of land for $11,500, and added the
nurses' residence in a separate building on one corner of
the tract because Dr. Rossi had experienced difficulty finding
suitable housing for unmarried nurses in Hopedale. Con-
struction of a 22-room, 40-bed nursing home, or extended
care facility, was begun in 1957 and completed in 1958.
This facility, which was intended primarily to care for the
sick and disabled and to provide long-time convalescent care
at a lower daily cost than the hospital, was connected with
the hospital by a ramp-type hallway and was served by the
hospital staff. One half of the money for the nursing home,
or $90,000, was raised through the sale of nursing home
or preferential certificates purchased for $750 and redeem-
able in 20 years at $1,000 or by the use of the facilities in
that amount from the date of purchase. Dr. Rossi was the
obligor on these certificates.

In 1960, construction began on Hopedale House, a 24-
unit home designed for elderly people not in acute need of
nursing care. The home, which was completed in 1961, was
not physically connected to the hospital or the nursing home,
but was tied to the nursing home by a communication
system that enabled residents of the facility to obtain as-
sistance by pushing a button. Moreover, members of the
hospital and nursing home staff made daily rounds in
Hopedale House. The home was financed by a 100% con-
struction loan of $225,000 to Dr. and Mrs. Rossi from First
Federal Savings and Loan Association of Peoria.

Upon completion of this construction, Dr. and Mrs.
Rossi were the sole owners of all the property and buildings
of the complex, and their total personal indebtedness

amounted to about $500,000, primarily with First Federal Savings and Loan Association of Peoria. Dr. Rossi operated the complex as a sole proprietorship, and he also functioned as medical director and administrator. He continued his private practice of medicine out of his office in the hospital, and he owned and operated the pharmacy on the premises. He was still the sole resident physician in Hopedale.

The Hopedale Medical Foundation was incorporated as an Illinois not-for-profit corporation on June 7, 1961. The original incorporators, Dr. Rossi, his wife, and Frederick M. Bourland, executive vice-president of First Federal Savings and Loan Association of Peoria, were the only voting members of the Foundation throughout the period involved in this cause. They elected Dr. Rossi, his wife, Bourland, Arber Johnson, and John E. Cassidy, Jr. to serve as directors of the Foundation, and those directors remained on the board throughout the period involved in this suit. Dr. Rossi was named president of the board.

On July 1, 1961, the Foundation purchased the land and buildings of the sole proprietorship from Dr. and Mrs. Rossi for $760,000. The board of directors agreed to assume all of the Rossis' outstanding long-term indebtedness, which then amounted to $612,129.09, and to pay them $147,870.91, of which $12,870.91 would be in cash and the balance a promissory note for $135,000 payable at the rate of $5,000 annually plus annual interest of 3% on the unpaid balance. The note was secured by a second mortgage on the Foundation real estate. The property of the complex was appraised several months before the sale at $725,000, and the county supervisor of assessments testified that the total assessed value of the land and improvements on January 1, 1962 was $463,240, estimated to be 15 to 20% below fair market value. In addition, unaudited financial statements showed that the predecessor proprietorship transferred to the Foundation other assets valued at $162,618,

and that the Foundation assumed other liabilities amounting to $66,906. The Foundation's opening balance sheet therefore showed a beginning net equity of $95,712, which Dr. Rossi claimed was a gift to the Foundation but which he failed to take as a charitable deduction on his Federal income tax return. The balance sheet of the predecessor proprietorship as of the date of sale showed Dr. Rossi's total equity in the complex at $71,303.86. A note to the financial statement explained that "owner's equity includes $50,000 provided in 1958 and $11,500 provided in 1961 by individuals with the stipulation that the Nursing Home provide them future medical and nursing care free of charge when, and if, they decide to enter the nursing home." The contributions were used for construction purposes and included labor and material costs in land and buildings sold to the Foundation. Two of the contributors received medical care and treatment at the Foundation's expense subsequent to the sale of assets, and Dr. Rossi received payment from the Foundation for the services he rendered them.

After incorporation as a not-for-profit corporation and the transfer of assets, the Foundation undertook further expansion of the facilities of the complex. In 1962 construction began on a 24-bed hospital addition which opened in February, 1963. In 1964, further expansion was undertaken which completed the complex to the extent it existed at the time of the trial. The additions included 46 beds to the nursing home, 38 rehabilitation beds, a new rehabilitation department available to both hospital and nursing home patients, an entire wing of the hospital, a medical arts building for out-patient services, a new addition to the nursing home, and new laundry and kitchen facilities to serve the entire complex. The medical arts building included a waiting room, pharmacy area, testing rooms, a dentist office, hospital laboratory and X-ray department, and office space for Dr. Rossi. During the tax years in question, the

Foundation incurred losses of $23,882 in 1962 and $92,860 in 1966, and earned income of $8,443 in 1963, $91,776 in 1964, and $7,109 in 1965.

The Board of Directors of the Foundation appointed Dr. Rossi as the medical director and chief administrator of the complex, for which he was to be paid a starting salary of $18,000 per year. He continued in the position of administrator until December, 1964, when a professional administrator, Edward Gilgan, was hired. An organization chart shows that the administrator and all other employees of the Foundation were directly or indirectly responsible to Dr. Rossi, who as medical director had full managerial authority for the operation of the complex. An accountant testified that during the five-year period 1962 through 1965, a total of $74,494.38 in salary was actually paid to Dr. Rossi, in the following amounts: in 1962, $10,000; in 1963, $10,000; in 1964, $12,499.98; in 1965, $15,453.27; and in 1966, $26,541.13. There were times during the first three years of the Foundation's existence when it was unable to pay Dr. Rossi's salary on a current basis, but by June 30, 1965, he had been paid up to date. Dr. Rossi testified on direct examination:

"Q. Did you continue pretty much with the same responsibility after the Foundation took over as you did before?

A. Yes, there was just more of it. * * *

Q. At that time, did you see your private patients as they came to see you, and take care of them as well as administering both medically and operationally the overall complex?

A. Exactly.

Q. And have you continued to do so in some extent since July 1, 1961?

A. That's right."

In the summer or fall of 1961, Dr. Rossi formed a private medical partnership with Dr. Albert Maurer, who

was also employed by the foundation as the hospital's house physician at $300 per month. From July, 1961, to November, 1965, the partnership paid to the Foundation monthly rental of $250, including utilities and janitorial service, for office facilities in the nurses' residence and also reimbursed the Foundation for the services of two nurses who assisted the doctors in their private practice. In November, 1965, Dr. Rossi moved his offices into the new medical arts building, where he carried on the private practice of medicine in partnership with Dr. Maurer in generally the same manner as he had at other locations in the complex since 1955. Rent for office space in the medical arts building from November, 1965, throughout the period involved in this suit was $100 per month including utilities, janitorial services, and telephone expense. In addition, the partnership utilized the services of one full-time and two or three part-time nurses, as well as a receptionist, whose salaries were paid by the Foundation, which in turn was reimbursed by the partnership. During the period 1965 through 1966, 20-25% of the patients admitted to the hospital and 20-35% of the nursing home patients were estimated to be patients of the Rossi-Maurer partnership.

During the tax years in question, the Foundation paid to Dr. Rossi, in addition to his salary as medical director, fees for administering anesthetics and for performing pre-operative and post-operative services for patients in the hospital. The Foundation also paid Dr. Rossi at the rate of $5 per person over and above his salary as medical director for giving physical examinations to employees of the Foundation as required by State law. An accountant testified that the total of amounts payable to Dr. Rossi by the Foundation for such things as reductions on the second mortgage, administration of anesthetics, examinations of employees, and charges incurred for lifetime lease patients —together with the amounts receivable from Dr. Rossi for such things as rental of office space—accounted for $55,-

305.55 during the five-year period in question. The account-
ant further testified that this figure, added to the total of
$74,494.38 which Dr. Rossi was paid as salary during the
five-year period, represents an estimate of the cash flow or
the equivalent of cash through services and supplies ren-
dered by the Foundation to Dr. Rossi.

In addition, during the tax years in question several of
Dr. Rossi's children served as summer replacements for
employees of the Foundation and otherwise filled-in for
employees when they were sick. Dr. Rossi's brother was on
the Foundation's payroll for several months as food service
manager. During the same period, Dr. Rossi's mother-in-
law was hospitalized in the Hopedale hospital and any
amount not covered by insurance or otherwise was written
off simply because of her status as his mother-in-law. On
many occasions when the Foundation had no money cur-
rently available to pay Dr. Rossi's salary, the Rossi family
enjoyed the advantage of volume buying of groceries by
the Foundation, which was exempt from sales taxes. The
Foundation would add the family's grocery needs to its
institutional order, give the groceries to the family when
they had been delivered, and then bill Dr. Rossi for them.

Dr. Rossi formed Lawrence J. Rossi and Associates to
advise other groups and individuals on how to set up nurs-
ing home facilities similar to those at Hopedale. On Sep-
tember 15, 1964, Rossi and Associates entered into a written
agreement with the Chillicothe Hospital Foundation in Chil-
licothe, Illinois, to help establish the Park Hill Nursing
Home. Dr. Rossi testified that personnel from the Park Hill
home, including the administrator and the chief nurse, were
trained on the premises of the Hopedale Medical Founda-
tion. The evidence further shows that personnel from Hope-
dale, including the chief administrator, the director of
nurses, the pharmacist, and the maintenance man, went to
Chillicothe to offer assistance. Edward Gilgan, Hopedale's
administrator and Dr. Rossi's associate in the consulting

firm, testified that Adrian Vrught lived and ate his meals at the Hopedale complex for four to six weeks before he was recommended to, and hired by, the Park Hill Nursing Home as its administrator. Gilgan stated that Vrught was trained as a hospital administrator at Hopedale in return for which Vrught instructed the personnel at Hopedale in the techniques of hotel management. For these services, the Chillicothe Foundation paid to Lawrence J. Rossi and Associates a lump sum of $4,800 plus $200 per month for a period of 15 months. The Hopedale Medical Foundation was not reimbursed, either by the Chillicothe Foundation or by Rossi and Associates, for the services it performed. In addition, Rossi and Associates received $5,000 in consulting fees for supervising the establishment of the Jackson Heights Nursing Home in Farmer City, Illinois. The head nurse, business manager, and a licensed practical nurse from the Jackson Heights home spent more than three months on and off training at the Hopedale nursing home. A man who had been hired by the Hopedale Foundation to help develop a proper accounting system for food costs was placed by Rossi and Associates as the administrator of the Jackson Heights home. Neither the Jackson Heights Nursing Home nor Rossi and Associates reimbursed the Hopedale Medical Foundation for services rendered.

After the complex was reorganized as a not-for-profit corporation, the pharmacy, which had been a part of Dr. Rossi's sole proprietorship prior to 1961, was separated from the Foundation and operated as a joint venture between Dr. Rossi and Mr. Welborn, a pharmacist. According to Dr. Rossi, it was decided to operate the pharmacy separately because public aid regulations prohibited a hospital pharmacy from filling prescriptions for public aid out-patients and because the pharmacist could make a better living as an out-patient pharmacist than as a salaried employee of the Foundation. The Hopedale Medical Foundation agreed to purchase pharmaceutical supplies and drugs from the phar-

macy at cost plus 10%. The pharmacy capitalized the pharmaceutical inventory of the hospital and released supplies into the hospital's drug dispensing mechanism as needed. In addition, Welborn served as the chief pharmacist for the hospital at a salary of $100 per month. From 1961 until 1965, the pharmacy operated from facilities in the nurses' residence, for which it paid rental to the Foundation of $100 per month. After 1965, the pharmacy moved into the medical arts building where the rent was $150 per month including utilities, janitorial service, and telephone. In each of the tax years in question, the pharmacy showed a profit, ranging from a low of $8,868 in 1962 to a high of $15,444 in 1964. Dr. Rossi testified on cross examination:

"Q. Doctor, did you obtain any benefit from the operation of the pharmacy?

A. Many benefits, many ways.

Q. Doctor, did you obtain any benefit in the operation of your private medical practice on the Foundation property?

A. Many benefits, much satisfaction.

Q. Now, Doctor, were these benefits we are referring to financial benefits?

A. In many instances, very slightly so."

It is well settled in this State that a statute which exempts property from taxation should be strictly construed in favor of taxation, and that the burden is on the person claiming an exemption to prove clearly and conclusively that he is entitled to one. *People ex rel. Cannon* v. *Southern Illinois Hospital Corp.*, 404 Ill. 66; *Coyne Electrical School* v. *Paschen*, 12 Ill.2d 387, 390; *Methodist Old Peoples Home* v. *Korzen*, 39 Ill.2d 149, 155; *People ex rel. Nordlund* v. *Winnebago Home for the Aged*, 40 Ill.2d 91, 99-100; *Willows* v. *Munson*, 43 Ill.2d 203.

Although each case must be decided on its own facts (*People ex rel. Cannon* v. *Southern Illinois Hospital Corp.*, 404 Ill. 66; *Methodist Old Peoples Home* v. *Korzen*, 39

Ill.2d 149, 156), several of our prior decisions furnish guidelines and criteria as to what constitutes exclusive use for a charitable purpose. In *Coyne Electrical School* v. *Paschen,* 12 Ill.2d at 400, we concluded that "the proof relating to the metamorphosis of the school from a profit to a nonprofit corporation" mitigated against use for an exclusively charitable purpose. The same individual who organized and controlled a trade school for profit retained complete control of the school's educational and financial affairs after reorganization as a not-for-profit corporation, and the profits of the new corporation continued to inure to his benefit since he owned all the outstanding bonds of the old corporation as well as all the installment bonds issued by the new one. In addition, the controlling individual received an annual salary from the school of $50,000. In *People ex rel. Cannon* v. *Southern Illinois Hospital Corp.,* 404 Ill. 66, where a tax exemption was allowed, we emphasized that the founders of a charitable hospital made no charges for their services and received no salaries when they performed specialized functions for the hospital. See also, *Sisters of Third Order of St. Francis* v. *Board of Review,* 231 Ill. 317, 323.

When all debatable questions are resolved in favor of taxation, we think the defendant failed to meet its burden of showing clearly and conclusively that its facilities were used exclusively for a charitable purpose within the statutory and constitutional provisions. Indeed, the following factors demonstrate to our satisfaction that the Foundation was operated at least in part for the professional and financial benefit of Dr. Rossi and his associates. Although there was a change in the ownership and organizational structure of the medical complex, Dr. Rossi retained complete control of the Foundation after the sale of the assets of his sole proprietorship, and he continued to use the facilities of the complex in the same manner as before the reorganization. He derived a substantial salary from the

Foundation for the performance of managerial services and specialized medical functions, and he had a large continuing claim against the assets of the Foundation in the form of installment notes payable at the rate of $5,000 per year plus interest. In addition, Dr. Rossi benefited, at least indirectly, from the private practice of medicine on Foundation property and from the use of Foundation facilities as an adjunct to his various business pursuits. He derived direct financial benefits from the receipt of fees for a consulting service he carried on with the aid of Foundation personnel and property, and from the operation of a private out-patient pharmacy that supplied drugs to the hospital on a cost-plus basis.

The defendant relies heavily on the fact that it has been granted a letter of exemption from Federal income taxes under section 501(c)(3) of the Internal Revenue Code (26 U.S.C. sec. 501(c)(3)), and that it is exempt from Illinois sales and use taxes. But these exemptions do not "furnish material facts about exclusive charitable use of property under our constitution" (*Willows* v. *Munson,* 43 Ill.2d 203; see, also, *Coyne Electrical School* v. *Paschen,* 12 Ill.2d 387, 396), and the existence of such exemptions is not determinative of the issue before us.

Counsel for both parties agree that the facilities of the Foundation, including Hopedale House, the nursing home, and the nurses' residence, are interrelated parts of a single medical complex. We have not discovered any basis upon which to sever the facilities of the complex into taxable and tax-exempt components, and none has been suggested. The decision of the circuit court of Tazewell County is therefore reversed and the cause is remanded for the entry of an order granting the collector's application for judgment in full.

*Reversed and remanded, with directions.*