DECATUR SPORTS FOUNDATION, Plaintiff-Appellee, v. THE DEPARTMENT OF REVENUE, Defendant-Appellant.

Fourth District   No. 4—88—0194

Opinion filed December 28, 1988.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Bret A. Rappaport, Assistant Attorney General, of Chicago, of counsel), for appellant.

Philip L. Bateman, of Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

This appeal arises from an attempt by plaintiff, Decatur Sports Foundation (Foundation), to obtain a charitable tax exemption for the year 1985 for Borg-Warner Field (field), a 40-acre sports complex in Decatur. The Department of Revenue (Department) denied the exemption. On administrative review, the circuit court of Macon County reversed, ruling the Foundation met the requirements for charitable exemption set forth in section 19.7 of the Revenue Act of 1939 (Act) (Ill.

Rev. Stat. 1985, ch. 120, par. 500.7). The Department appeals, arguing the Foundation is not a charitable organization and did not use the field for exclusively charitable purposes.

This appeal presents questions not reached in a previous appeal before this court involving the 1984 tax year. In *Decatur Sports Foundation v. Department of Revenue* (1987), 156 Ill. App. 3d 623, 509 N.E.2d 1103, (*Decatur Sports Foundation I*), a panel of this court ruled improvements made by the Foundation should not have been assessed separately from the underlying parcel, owned for most of 1984 by Borg-Warner Corporation. The court did not determine whether the Foundation was charitable or whether the property was exclusively used for charitable purposes under section 19.7.

The facts are undisputed. On December 13, 1985, the Foundation filed an application for a charitable tax exemption with the Macon County Board of Review (Board). The Board issued a notice recommending exemption December 23, 1985. The Department denied the application for exemption November 17, 1986, stating the property was neither in exempt ownership nor in exempt use. Following a formal hearing, the Department again denied the application, concluding that while the Foundation owned the property during 1985, the Foundation was not a charitable organization, and the primary use to which the property was put in 1985 was recreational, not charitable. Plaintiff filed its complaint for administrative review in Macon County circuit court July 15, 1987. The court determined the Foundation was a charitable organization and it used the field for charitable purposes by written order dated February 22, 1988. The Department filed its notice of appeal March 14, 1988.

The property in question was originally owned by the Marvel-Schebler/Tillotson Division of Borg-Warner Corporation (Borg-Warner) and intended for future expansion. Borg-Warner entered into a lease dated January 2, 1974, with Decatur Boys' Baseball (Boys' Baseball) for the purpose of developing facilities for youth baseball. Richard Lutovsky, president of the Foundation, testified at the hearing that Boys' Baseball, an organization that conducts baseball games for boys and girls, sought to hold its games outside the park district fields, which were experiencing overcrowding. Boys' Baseball leased the field from Borg-Warner at a rent of $1 per year.

In January 1979 the Decatur Softball Booster Club, Inc. (Booster Club), which supported the local men's fast-pitch softball team (then the Decatur A's), successfully bid to hold the 1980 American Softball Association's national tournament at Borg-Warner Field. At that time, the field had inadequate facilities for such a tournament. On

April 16, 1979, the Borg-Warner Decatur Sports Foundation was incorporated as a not-for-profit corporation to take over the management and improvement of the field. The name was changed to Decatur Sports Foundation the following year. The Foundation's articles of incorporation stated the organization's purposes:

> "To operate exclusively for charitable and educational purposes; to provide facilities for education, training and participation of all youths and adults residing in the City of Decatur, Illinois and Macon County, Illinois, in baseball, softball, soccer and other sports; to provide instruction and training for all youths and adults residing in the City of Decatur, Illinois and Macon County, Illinois, in baseball, softball, soccer and other sports. To encourage and support the foregoing purposes this corporation shall organize and promote tournaments and competition in baseball, softball, soccer and other sports at the local and national levels, including the sale of food and beverage, alcoholic and non-alcoholic, at such tournaments, provided the proceeds of such sales be used exclusively for the charitable and educational purposes aforesaid."

The articles provided that in the event of the Foundation's dissolution, the assets were to be distributed to charitable or educational organizations which instruct and train youth in baseball and other sports.

On July 27, 1979, Boys' Baseball assigned to the Foundation its interest in the lease with Borg-Warner and conveyed ownership of improvements made to the field. At that time five diamonds existed on the property. The agreement specified the Foundation desired to construct a softball stadium to be used for the 1980 national tournament. In exchange for its assignment of interest, Boys' Baseball was given unrestricted use of the four existing unlighted baseball diamonds at the field. In addition, it received unrestricted use of the lighted diamond daily until 6 p.m. and at least three evenings per week after 6 p.m. The agreement also stated: "If more than one (1) baseball diamond is in the future artificially lighted, Boys' Baseball will have use of such additional artificially lighted diamond or diamonds after 6 p.m. for three (3) evenings per week."

The Foundation leased the field from Borg-Warner for an annual rent of $1. The lease term ran from February 1, 1980, through January 31, 1990, with two five-year options. The Foundation subsequently raised $40,000 and borrowed $170,000 for purposes of constructing a press box, lights, scoreboard, fences, and dugouts. The Foundation also improved the field and parking areas, and purchased

and installed bleachers. Some materials and all labor were donated. The lighted diamond was referred to as diamond No. 1. After 1980, the Foundation added restaurant and storage areas, extra bleachers, a new scoreboard, fences, and improvements to the locker room, roadway, and parking lot.

In 1980, Archer-Daniels-Midland Company (ADM) assumed sponsorship of the men's fast-pitch team, now called Decatur ADM. On March 19, 1981, the Foundation and ADM entered into an agreement with respect to use of diamond No. 1 from 1981 through 1985. The agreement required ADM to submit its schedule of games by February 28 each year. It prohibited ADM's season from conflicting with that of Boys' Baseball. ADM was to receive 100% of the ticket proceeds, but the division of concession proceeds was subject to yearly renegotiation. ADM was also to buy and install 2,000 aluminum seats.

ADM agreed to guarantee the Foundation's $170,000 note with Millikin National Bank, which waived interest payments upon obtaining the guarantor. Although the agreement is not in the record, the Foundation's 1984-85 financial statement shows that in consideration, the Foundation agreed to use its net proceeds, including gifts, to reduce the debt. It agreed to ADM's use of the No. 1 diamond for all dates requested by February 28 annually through the year 2000. The financial statement indicates in 1984 the debt totalled $170,000, and was reduced to $113,333 during 1985.

In addition to ADM and Boys' Baseball, the Foundation entered into agreements with three other organizations. On April 7, 1981, it entered into an agreement with Decatur BMX Club, Inc. (BMX), a not-for-profit corporation involved with bicycle racing, governing BMX' use of part of the field from 1981 through 1985. BMX' use of the field was subject to the provisions of the agreements between the Foundation and Boys' Baseball plus the Foundation's lease with Borg-Warner. BMX was required to pay its own utilities plus $1 a year for a "license" to use part of the field. The agreement did not require BMX to make improvements. BMX agreed to maintain a parking area on adjacent park district property and also to install and maintain a gravel road linking the baseball parking lot with the BMX parking lot.

On November 11, 1981, the Foundation and the Decatur YMCA Soccer Club (Soccer Club) entered into a similar agreement. For an annual fee of $1, the Foundation granted the Soccer Club a license to use part of the field. The Soccer Club agreed to make certain "capital improvements" at its own expense. The Soccer Club was required to submit its schedule of events by February 28 of each year. The Soccer Club's use of the field was subject to the Foundation's agreements

with Borg-Warner and Boys' Baseball. Although testimony indicated another portion of the field was used by a radio-controlled race car club, no agreement with that group appears in the record on appeal.

The Foundation was classified as a charitable organization for purposes of exemption from Federal income tax, Illinois use tax, service use tax, and State and local retailers' occupation and service occupation taxes. On December 5, 1984, Borg-Warner executed a quitclaim deed in the Foundation's favor pursuant to an "Agreement for Gift" entered into by the parties. The agreement provided that in the event the Foundation was dissolved, the property would be distributed only to charitable or educational organizations having training of youth in baseball among their purposes.

The Foundation's 1984-85 financial statement shows that during 1985, the Foundation's primary sources of receipts were contributions, concession receipts, and billboard rental. Contributions in 1985 totaled $76,117. Lutovsky testified that contributions came from ADM, Borg-Warner, and A.E. Staley. ADM donated $55,000 to repay the loan with Millikin National Bank. Lutovsky provided no other breakdown for the remaining sum. The second largest source of revenue for the Foundation during 1985 was concession receipts, which netted $11,314. The Foundation operates its concession stand at all scheduled events. It has a license to sell beer and wine, although alcoholic beverages are not served at any events involving children.

In 1985 the Foundation also generated $4,600 by renting billboards on the fences surrounding diamond No. 1. The Foundation also received $375 from field rentals during 1985. Lutovsky explained that organizations which used the field between scheduled events were charged a $25 fee, which paid for field preparation and lights. Organizations which did not require field preparation or lighting were not charged the $25. Lutovsky testified that the facilities are open to anyone "interested in furthering youth activities or charitable events."

Lutovsky testified Boys' Baseball used the field most extensively, with 500 to 600 games per year plus tournaments. About 1,000 boys and girls participate. Games are conducted four to five nights a week using all six diamonds. Over 1,000 boys and girls participated in Soccer Club games. The field could accommodate four games simultaneously. Lutovsky stated BMX constructed a track for children's bicycle competition. Races are held on Sundays, though the track is available other days. The BMX program involved "hundreds of youth," although Lutovsky offered no exact figure. He described the model car race club as a small group consisting of teens and adults. He stated the Foundation tried to regularly schedule State and regional tourna-

ments. He stated the "Pony" baseball organization played several tournaments at the field in 1985.

Lutovsky testified the men's fast-pitch team played 25 to 30 home games on diamond No. 1, mostly prior to and after the Boys' Baseball season and on weekends. About 10 to 15 games overlap the Boys' Baseball season. Both groups schedule their own games and obtain their own umpires. ADM concluded its sponsorship of the men's fast-pitch team following the 1985 season. Lutovsky stated the team, renamed the Decatur Pride, was managed by the Booster Club and sponsored by the community. The Foundation submitted into evidence a 1986 Decatur Pride schedule, which Lutovsky testified was similar to the 1985 schedule.

Richard Dechert, general manager of the field since late 1985, testified that in addition to the organizations that have agreements with the Foundation, several other groups have used the field: St. Mary's Hospital, high schools, United Parcel Service, fire fighters and other ball clubs. In 1985, tournaments were held by the Jaycees, Cerebral Palsy, and the Police Benevolent Association. A 24-team girls' softball tournament, including three Decatur teams, took place at the field. Adult slow-pitch tournaments are held during the summer or at the end of the Boys' Baseball season. Millikin University used the field for its Greek Days and a tournament held by the School of Business. The Foundation charged $25 for each event to defray the cost of grounds preparation and the Foundation's expenses. Dechert testified Macon High School played its home games at the field because its own field was not ready. The Foundation provided bases and liming equipment, and did not charge the school. Khoury Baseball Organization, a youth group, conducted an all-star game or other special event at the field. The field was also the site of a game between the Decatur and Springfield city councils. Dechert testified children and adults play pickup games at the field when the diamonds are otherwise unoccupied.

Dechert testified that a number of volunteers assisted with maintenance, mowing, and concessions. Admission for ADM games goes to the Booster Club, not to ADM. He stated a third of Boys' Baseball games are played in Decatur parks because the Foundation does not have enough diamonds to fill the need. Dechert estimated 10 to 15 Decatur Pride home games took place during the Boys' Baseball season. He testified eight games per night can be played on the Field's four unlighted and two lighted diamonds, totalling about 750 games during the Boys' Baseball mid-May to mid-August season.

Included in the record of the hearing by stipulation of the parties

was testimony by Gerald Menz, director of recreation for Decatur Park District. This testimony was given by Menz during the formal hearing before the Department's administrative law judge in *Decatur Sports Foundation I*. Menz stated by affidavit and testimony that without the facilities at the field, the park district would have to build more baseball diamonds, reschedule games to less desirable times, and reduce the number of games. He stated the park system contained between 67 and 75 ball diamonds, which were in use from 5 to 10 p.m. Monday through Friday. Excluding Little League, 398 softball teams existed in Decatur.

The Department denied the exemption application June 30, 1987. The administrative law judge concluded the primary sources of income were ADM's contribution and concessions. He found ADM's contribution went to the benefit of the ADM team, and any charity dispensed came not from the Foundation, but from the organizations with whom the Foundation had agreements. Under the guidelines set forth by the supreme court in *Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 233 N.E.2d 537, the administrative law judge concluded the Foundation was not a charitable organization. He stated the primary use of the property was recreational, not charitable.

In reversing the finding of the Department, the circuit court looked to the definition of charity in *Crerar v. Williams* (1893), 145 Ill. 625, 34 N.E. 467, plus the guidelines set forth in *Methodist Old Peoples Home* in concluding athletics help children "establish themselves for life," thus constituting a charity. The judge cited the statutory requirement of physical education in school (Ill. Rev. Stat. 1985, ch. 122, par. 27—5) and the creation of the President's Council on Physical Fitness as recognizing the importance of physical activity. The judge ruled ADM's large contribution during 1985 did not destroy the charitable nature of the Foundation, as the use of the field by ADM's team was incidental. The court stated that while not all recreational facilities may be charitable, some may be charitable in nature and require a case-by-case determination. The judge concluded the Foundation dispensed charity by providing a facility where other organizations could carry out their goals. This was deemed sufficient to qualify the Foundation as a charitable organization. This appeal followed.

The Department argues the Foundation is not a charitable organization under section 19.7. The Foundation contends its activities constitute a sufficient basis on which to confer charitable status.

Initially, the parties agree amendments made to section 19.7 by

Public Act 85—312, effective September 10, 1987 (amending Ill. Rev. Stat. 1985, ch. 120, par. 500.7), are inapplicable to this case. Public Act 85—312 exempted property of "not-for-profit organizations providing services or facilities related to the goals of educational, social and physical development." (Ill. Rev. Stat. 1987, ch. 120, par. 500.7.) The legislation also provided the amendment did not apply to property whose tax-exempt status was being litigated "in any court" on the effective date. (Ill. Rev. Stat. 1987, ch. 120, par. 500.7.) The Foundation filed its complaint for administrative review in Macon County circuit court July 15, 1987. The court issued its decision February 22, 1988. Therefore, the tax-exempt status of the field was being litigated in the circuit court on September 10, 1987, the amendments' effective date.

■ In order to qualify for exemption, the Foundation must prove the property was owned by a charitable organization and used exclusively for charitable purposes. (*Coyne Electrical School v. Paschen* (1957), 12 Ill. 2d 387, 397, 146 N.E.2d 73, 79; *Good Samaritan Home v. Department of Revenue* (1985), 130 Ill. App. 3d 1036, 1039, 474 N.E.2d 1387, 1390.) The burden is on the applicant to prove eligibility for exemption by clear and conclusive evidence. *Board of Certified Safety Professionals of the Americas, Inc. v. Johnson* (1986), 112 Ill. 2d 542, 547, 494 N.E.2d 485, 488; *Coyne Electrical School*, 12 Ill. 2d at 390, 146 N.E.2d at 75.

The scope of review in administrative cases is governed by section 3—110 of the Administrative Review Law (Ill. Rev. Stat. 1983, ch. 110, par. 3—110). That section specifies the findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct. (*Department of Revenue v. Smith* (1986), 150 Ill. App. 3d 1039, 1049, 501 N.E.2d 1370, 1378.) Since the facts in this case are undisputed, whether the property is exempt is a question of law. (*Caterpillar Tractor Co. v. Department of Revenue* (1963), 29 Ill. 2d 564, 566, 194 N.E.2d 257, 258; *Lutheran Child & Family Services v. Department of Revenue* (1987), 160 Ill. App. 3d 420, 423, 513 N.E.2d 587, 589.) Exemption from Federal income tax and from State sales and use taxes is not determinative of whether the subject property is used for charitable purposes. *People ex rel. County Collector v. Hopedale Medical Foundation* (1970), 46 Ill. 2d 450, 264 N.E.2d 4.

Article IX of the Illinois Constitution provides:

"The General Assembly by law may exempt from taxation only the property of the State, units of local government and school districts and property used exclusively for agricultural

and horticultural societies, and for school, religious, cemetery and charitable purposes." Ill. Const. 1970, art. IX, §6.

Section 19.7 of the Act exempts:

"All property of institutions of public charity, all property of beneficent and charitable organizations, *** when such property is actually and exclusively used for such charitable or beneficent purposes, and not leased or otherwise used with a view to profit ***." Ill. Rev. Stat. 1983, ch. 120, par. 500.7.

Our analysis begins with the definition of charity stated in *Jackson v. Phillips* (1867), 96 Mass. (14 Allen) 539, 556, and adopted by the supreme court in *Crerar v. Williams* (1893), 145 Ill. 625, 643, 34 N.E. 467, 470:

" 'A charity, in a legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the [burdens] of government. It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable in its nature.' "

The trial court concluded the Foundation helped children establish themselves for life by providing a facility where children could participate in athletic events. Neither the trial court nor the parties supplied a definition of the term "establish for life." Our research discloses none. The phrase has not survived the supreme court's most recent restatements of the *Crerar* definition in *Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 157, 233 N.E.2d 537, 541-42, and *People ex rel. Nordlund v. Association of the Winnebago Home for the Aged* (1968), 40 Ill. 2d 91, 237 N.E.2d 533.

■ Even if we were to hold the providing of sports facilities does not establish children for life, however, the Foundation lessens a government burden. Testimony showed about 1,000 children participated in Boys' Baseball. About the same number played in games organized by the Soccer Club. Menz' testimony, included in the record by stipulation, indicated the park district owned between 67 and 75 ball diamonds, 17 of which were lighted. Between May and September, three games per night were played on the lighted diamonds. Excluding Little League, 398 softball teams existed in Decatur. Menz' affidavit stated that without the field, the park district would have to build more diamonds, reschedule games to less desirable times, or reduce

the number of games. This is sufficient evidence from which to conclude the Foundation reduces the burden of government by privately supplementing public recreational facilities.

Relying on *Turnverein "Lincoln" v. Board of Appeals* (1934), 358 Ill. 135, 192 N.E. 780, the Department asserts property used for recreational purposes is not charitable. *Turnverein "Lincoln"* involved an organization primarily funded by memberships and only incidentally by nonmember user fees. In rejecting the argument that the institution was charitable, the court relied on its finding that the recreational facilities were intended to benefit members. Here, the Foundation does not require membership in order to use the field.

The Department argues the burden which must be lessened here is one which must be assumed by government. *Board of Certified Safety Professionals of the Americas, Inc. v. Johnson* (1986), 112 Ill. 2d 542, 494 N.E.2d 485, cited by the Department, does not directly support this view. In *Johnson,* the supreme court noted, *inter alia,* that since the State did not register and license safety professionals, the organization did not relieve a governmental burden. The court did not state whether the burden must be one required of the government. We agree with the Department that providing recreational facilities is not an obligation government must perform. However, municipalities are empowered to provide such facilities through the creation of park districts. (See Ill. Rev. Stat. 1985, ch. 105, par. 1—1 *et seq.*) The Decatur Park District has undertaken the task of providing recreational facilities, such as baseball diamonds, in its parks. Testimony showed those facilities would be severely strained without the Field's additional diamonds. We conclude the Foundation, by operating the field, has reduced a governmental burden. See *Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 233 N.E.2d 537 (a charity in some way reduces a governmental burden); *Rotary International v. Paschen* (1958), 14 Ill. 2d 480, 153 N.E.2d 4 (service organization with some charitable activities held not charitable; activities did not relieve State of burden to care for and advance citizens' interests); 15 Am. Jur. 2d *Charities* §56 (1976); Annot., *Validity, as for a Charitable Purpose, of Trust for Dissemination or Preservation of Material of Historical or Other Educational Interest or Value,* 12 A.L.R.2d 849, 881 (1950); see also *In re Estate of Eggan* (1963), 86 Idaho 328, 386 P.2d 563 (gift to city for purposes of establishing youth recreation building held charitable as lessening governmental burden).

Our conclusion is supported by precedents from other jurisdictions which broadly interpret the concept of charity. See *Matanuska-Susitna Borough v. King's Lake Camp* (Alaska 1968), 439 P.2d 441 (not-

for-profit camp organized for "religious, educational, social, charitable and recreational" purposes and used for a fee by children's organizations held charitable); *Stockton Civic Theatre v. Board of Supervisors* (1967), 66 Cal. 2d 13, 18, 423 P.2d 810, 815, 56 Cal. Rptr. 658, 663 (not-for-profit civic theater held charitable; court relied on *Jackson* criteria plus view that concept of charity encompasses "activities *** humanitarian in nature and rendered for the general improvement and betterment of mankind"); *Tharpe v. Central Georgia Council of Boy Scouts of America* (1938), 185 Ga. 810, 196 S.E. 762 (not-for-profit camp used by Boy Scouts held "purely public" charity, as membership in Boy Scouts was open to all boys upon reaching a certain age); *Central Board on Care of Jewish Aged, Inc. v. Henson* (1969), 120 Ga. App. 627, 629, 171 S.E.2d 747, 749, quoting *Tharpe v. Central Georgia Council of Boy Scouts of America* (1938), 185 Ga. 810, 814, 196 S.E. 762, 764 (" '[c]harity *** extends to other forms of philanthropy or public beneficence, such as practical enterprises for the good of humanity *** or enterprises operated for the general improvement and happiness of mankind' "); *In re Appeal of Sunny Ridge Manor, Inc.* (1984), 106 Idaho 98, 100, 675 P.2d 813, 815 ("[t]he word 'charitable,' in a legal sense, includes every gift for general public use, whether it be for educational, religious, physical or social benefit"); *Coeur D'Alene Public Golf Club, Inc. v. Kootenai Board of Equalization* (1984), 106 Idaho 104, 675 P.2d 819 (not-for-profit organization incorporated to operate public golf course held charitable based on public benefit); *Taylor v. Hoag* (1922), 273 Pa. 194, 116 A. 826 (trust to promote improvements in the structure and methods of government held charitable).

■ Both parties also support their positions with criteria set forth by the supreme court in *Methodist Old Peoples Home v. Korzen* (1968), 39 Ill. 2d 149, 156-57, 233 N.E.2d 537, 541-42, in which the court stated:

"It has been stated that a charity is a gift to be applied, consistently with existing laws, for the benefit of an indefinite number of persons, persuading them to an educational or religious conviction, for their general welfare—or in some way reducing the burdens of government (*Crerar v. Williams*, 145 Ill. 625 [34 N.E. 467, 21 L.R.A. 454]); that the distinctive characteristics of a charitable institution are that it has no capital, capital stock or shareholders, earns no profits or dividends, but rather derives its funds mainly from public and private charity and *holds them in trust for the objects and purposes expressed in its charter, (People ex rel. Cannon v. Southern Illinois Hos-*

*pital Corp.*, 404 Ill. 66 [88 N.E.2d 20]; *People ex rel. Hellyer v. Morton*, 373 Ill. 72 [25. N.E.2d 504]; *Congregational Sunday School & Publishing Society v. Board of Review*, 290 Ill. 108 [125 N.E. 7]); that a charitable and beneficent institution is one which dispenses charity to all who need and apply for it, does not provide gain or profit in a private sense to any person connected with it, and does not appear to place obstacles of any character in the way of those who need and would avail themselves of the charitable benefits it dispenses, (*Sisters of Third Order of St. Francis v. Board of Review*, 231 Ill. 317 [83 N.E. 272]); that the statements of the agents of an institution and the wording of its governing legal documents evidencing an intention to use its property exclusively for charitable purposes do not relieve such institution of the burden of proving that its property actually and factually is so used, (*Skil Corp. v. Korzen*, 32 Ill. 2d 249 [204 N.E.2d 738]); *People ex rel. Pearsall v. The Catholic Bishop of Chicago*, 311 Ill. 11 [142 N.E. 520]); and that the term 'exclusively used' means the primary purpose for which property is used and not any secondary or incidental purpose. These principles constitute the frame of reference to which we must apply plaintiff's use of its property to arrive at a determination of whether or not such use is in fact exclusively for charitable purposes."

These characteristics have evolved into the following test: (1) the benefits derived are for an indefinite number of persons; (2) the organization has no capital, capital stock or shareholders, and does not profit from the enterprise; (3) funds are derived mainly from private and public charity, and the funds are held in trust for the objects and purposes expressed in the charter; (4) the charity is dispensed to all who need and apply for it; (5) no obstacles appear to be placed in the way of those seeking the benefits; and (6) the exclusive (primary) use of the property is for charitable purposes. (*Fairview Haven v. Department of Revenue* (1987), 153 Ill. App. 3d 763, 506 N.E.2d 341; *Good Samaritan Home v. Department of Revenue* (1985), 130 Ill. App. 3d 1036, 474 N.E.2d 1387; *In re Application of Clark* (1980), 80 Ill. App. 3d 1010, 400 N.E.2d 661.) These criteria have been used primarily to determine whether property is used for charitable purposes. See, *e.g.*, *Fairview Haven v. Department of Revenue* (1987), 153 Ill. App. 3d 763, 506 N.E.2d 341; *Good Samaritan Home v. Department of Revenue* (1985), 130 Ill. App. 3d 1036, 474 N.E.2d 1387.

We note the Department's administrative law judge applied the above test to determine if the Foundation was charitable. The circuit

court judge omitted the element of exclusive use. In the present case, requiring exclusive charitable use is of questionable value when determining whether the organization itself is charitable. It is well settled an organization acknowledged to be a charity under the law does not always put its property to a charitable use. *Small v. Pangle* (1975), 60 Ill. 2d 510, 328 N.E.2d 285, *cert. denied* (1975), 423 U.S. 918, 46 L. Ed. 2d 245, 96 S. Ct. 257; *Good Samaritan Home v. Department of Revenue* (1985), 130 Ill. App. 3d 1036, 474 N.E.2d 1387; *Fairview Haven v. Department of Revenue* (1987), 153 Ill. App. 3d 763, 506 N.E.2d 341; *Weslin Properties, Inc. v. Department of Revenue* (1987), 157 Ill. App. 3d 580, 510 N.E.2d 564; *Plymouth Place, Inc. v. Tully* (1977), 54 Ill. App. 3d 657, 370 N.E.2d 56.

In this case, the circuit court judge used a different articulation of the *Methodist Old Peoples Home* guidelines: (1) the organization has no capital, capital stock, or shareholders; (2) earns no profits or dividends; (3) derives its funds mainly from public and private charity and holds them in trust for the objects and purposes expressed in its charter; (4) dispenses charity to all who need and apply for it; (5) does not provide gain or profit in a private sense to any person connected with it; and (6) does not appear to place obstacles of any character in the way of those who need and would avail themselves of the charitable benefits it dispenses.

We are aware of other variations of this test used to determine if an organization is charitable. See, *e.g., Board of Certified Safety Professionals of the Americas, Inc. v. Johnson* (1986), 112 Ill. 2d 542, 546, 494 N.E.2d 485, 488 (organization must show, *inter alia*, it benefits the public at large, reduces the burdens of government, and derives its funds from public and private charity); *Oasis, Midwest Center for Human Potential v. Rosewell* (1977), 55 Ill. App. 3d 851, 370 N.E.2d 1124 (court looked to whether organization had capital, capital stock or shareholders, earned no profits and paid no dividends, and whether it derived its funds mainly from public and private charity and held them in trust for the objects and purposes expressed in its charter).

■ We choose to apply the *Methodist Old Peoples Home* guidelines to the facts of this case. The Department argues the Foundation benefits a select few groups and does not benefit an indefinite number of persons. The Foundation contends the benefits accrue to an indefinite number of persons. We agree with the Foundation.

A charity may confer a benefit to inhabitants of a particular city. (*People ex rel. Carr v. Alpha Pi of Phi Kappa Sigma Educational Association of the University of Chicago* (1927), 326 Ill. 573, 158 N.E.

213.) Here, the Foundation's articles of incorporation specify the facilities are for youths and adults residing in Decatur and Macon County. The Department argues that because certain groups have agreements to use the field, there is no benefit to an indefinite number of persons. We disagree.

Testimony indicated the soccer program and Boys' Baseball each served about 1,000 children. No figures were offered with regard to the race car club. Lutovsky suggested "hundreds of youth" were involved with BMX. Community groups like Millikin University, the Jaycees, and the Police Benevolent Association used the field. Furthermore, the benefits derived from the Foundation's sports complex go to the participants and the audiences. See *Stockton Civic Theatre v. Board of Supervisors* (1967), 66 Cal. 2d 13, 18, 423 P.2d 810, 815, 56 Cal. Rptr. 658, 663.

It is undisputed the Foundation has no capital, capital stock or shareholders, and earns no profits or dividends.

Whether the Foundation derives its funds mainly from public and private charity and holds them in trust for the objects and purposes expressed in its charter is the subject of dispute. The Department claims the largest cash contribution in 1985 came from ADM to obtain rights to use the large diamond for the fast-pitch team's games and thus does not constitute charity. The Department likewise contends income from concessions does not constitute charity. The Foundation claims the source of the contributions is immaterial and the existence of concession income does not change the Foundation's charitable nature.

The Foundation received over $76,000 in contributions during 1985. Lutovsky testified $55,000 of this amount came from ADM and was applied towards the Foundation's indebtedness to the Millikin National Bank. Lutovsky also testified the remaining amounts were donated in part by A.E. Staley and Borg-Warner. No breakdown is provided in the financial statement or in the testimony.

In *American College of Surgeons v. Korzen* (1967), 36 Ill. 2d 340, 224 N.E.2d 7, overruled on a limited and inapplicable part by *Christian Action Ministry v. Department of Local Government Affairs* (1978), 74 Ill. 2d 51, 383 N.E.2d 958, the supreme court adopted the view that where it is established funds and property are devoted to public purposes, the source of funds is not the sole determinate factor. The court determined an organization dedicated to medical knowledge exhibited public purposes sufficient to confer charitable status despite the fact its income consisted of dues from members. Here, the Foundation's articles of incorporation specify that among its purposes is to

provide facilities for education, training, and participation in sports of all youths and adults residing in Decatur and Macon County. The Department does not suggest this is not a public purpose. Under *American College of Surgeons*, the fact most of the contributions came from corporations in general and ADM in particular does not affect the Foundation's charitable nature. Furthermore, the Department does not suggest ADM's contribution is not private charity. Even if ADM's contribution was premised on first priority use of diamond No. 1, it was reasonable in light of the relatively small number of ADM home games and the significance of the Foundation's overall contribution to the community.

The fact the Foundation charges user fees to outside groups does not change the result. An organization that charges fees does not lose its charitable character if no profit is made and the amounts are applied toward the charitable purpose. (See *Congregational Sunday School & Publishing Society v. Board of Review* (1919), 290 Ill. 108, 125 N.E. 7.) Testimony showed the $25 fee was charged to recoup expenses of field preparation. It was waived if the group prepared the field itself. All income was spent on the management and upkeep of the field. Similarly, the concession income does not undermine the Foundation's charitable nature. A restaurant operated by a cooking school was considered an adjunct to the school in *School of Domestic Arts & Science v. Carr* (1926), 322 Ill. 562, 153 N.E. 669. Students put into practice what they learned in class. All proceeds from the restaurant went to the school's operation. Here, the concession stand operates as an adjunct to the Field's operation and, consequently, to the enjoyment of sports facilities. All concession proceeds are used to run the field.

Turning to the fourth factor, the Department maintains the Foundation does not dispense charity to all who need and apply for it since certain groups have priority at the field. This argument falls short. Sports facilities are of a different nature than food, clothing, and shelter. Scheduling is a necessity. The Department has not shown any group has been refused an opportunity to use the field.

The Department also contends the Foundation's agreements with Boys' Baseball, ADM, BMX, the Soccer Club, and the race car club constitute an obstacle to receipt of benefits. It argues the $25 fee charged to other users of the field is also an obstacle.

These agreements are not obstacles. Neither the agreements nor the $25 fee approach the large cash outlay present in *Good Samaritan* and *Fairview Haven*, or the admission fee, health requirements, and assignment of assets found to be an obstacle in *People ex rel.*

*Nordlund v. Association of the Winnebago Home for the Aged* (1968), 40 Ill. 2d 91, 237 N.E.2d 533. Furthermore, Dechert testified the $25 here was charged only to defray the cost of preparing the playing area. It was waived if the group prepared the diamond itself.

Under the foregoing *Methodist Old Peoples Home* criteria, the Foundation is charitable.

■■ Turning to the final inquiry, whether the property was exclusively used for charitable purposes, exclusive use means the primary use. (*Methodist Old Peoples Home*, 39 Ill. 2d at 157, 233 N.E.2d at 542.) The Department claims the property was not exclusively used for charitable purposes, but for a private recreational facility for ADM. This argument is without merit. If the providing of recreational facilities to community groups is charitable, then the property is exclusively used for charitable purposes if its primary use is to provide recreational facilities to the community. Testimony indicated Boys' Baseball played in excess of 500 games at the field. ADM's team played 20 to 30 games per season on diamond No. 1. ADM's use of the field was incidental and insufficient to alter the charitable use of the property. The Department's reliance on *Turnverein "Lincoln" v. Board of Appeals* (1934), 358 Ill. 135, 192 N.E. 780, is misplaced. In that case, the organization's revenue came from membership dues though nonmembers also paid a fee. Here, the Foundation does not require membership fees as a condition for using the field.

The Foundation has clearly and conclusively shown its eligibility for exemption during the tax year 1985. Accordingly, we affirm the decision of the circuit court of Macon County.

Affirmed.

LUND and SPITZ, JJ., concur.