**INDIANAPOLIS OSTEOPATHIC HOSPITAL, INC., d/b/a Westview Hospital and Health Institute of Indiana, Inc., Petitioners,**

v.

**DEPARTMENT OF LOCAL GOVERNMENT FINANCE,[1] Respondent.**

**No. 49T10–0012–TA–127.**

Tax Court of Indiana.

Dec. 9, 2004.

---

1. The State Board of Tax Commissioners (State Board) was originally the Respondent in this appeal. However, the legislature abolished the State Board as of December 31, 2001. 2001 Ind. Acts 198 § 119(b)(2). Effective January 1, 2002, the legislature created the Department of Local Government Finance (DLGF), *see* Indiana Code § 6–1.1–30–1.1 (West Supp.2004) (eff. 1–1–02); 2001 Ind. Acts 198 § 66, and the Indiana Board of Tax Review (Indiana Board). IND.CODE ANN. § 6–1.5–1–3 (West Supp.2004) (eff. 1–1–02); 2001 Ind. Acts 198 § 95. Pursuant to Indiana Code § 6–1.5–5–8, the DLGF is substituted for the State Board in appeals from final determinations of the State Board that were issued before January 1, 2002. IND.CODE ANN. § 6–1.5–5–8 (West Supp.2004) (eff. 1–1–02); 2001 Ind. Acts 198 § 95. Nevertheless, the law in effect prior to January 1, 2002 applies to these appeals. A.I.C. § 6–1.5–5–8. *See also* 2001 Ind. Acts 198 § 117. Although the DLGF has been substituted as the Respondent, this Court will still reference the State Board throughout this opinion.

Robert A. Hicks, Hall, Render, Killian, Heath & Lyman, P.S.C., Indianapolis, IN, Attorney for Petitioners.

Steve Carter, Attorney General of Indiana, Andrew W. Swain, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

2. In their initial complaints filed with the Court, the Petitioners also claim that their property is exempt from taxation because it is used for educational purposes. (*See* Pet'rs Pet. for Original Tax Appeal (filed Dec. 20, 2000) at 15–17; Pet'rs Pet. for Original Tax Appeal (filed Oct. 31, 2001) at 17–18.) Barring about three sentences in their reply brief, however, the Petitioners' presentation to this Court (both written and oral) has focused solely on how they are entitled to the charitable purposes exemption. (*Cf.* Pet'rs Reply Br.

## FISHER, J.

■ Indianapolis Osteopathic Hospital, Inc., d/b/a Westview Hospital (Westview), and Health Institute of Indiana, Inc. (HII) (collectively, the Petitioners) appeal the final determinations of the State Board of Tax Commissioners (State Board) assessing their real and personal property for the 1999 and 2000 tax years (the years at issue). The issue for the Court to decide is whether the Petitioners' property qualifies for the charitable purposes exemption as provided in Indiana Code § 6–1.1–10–16.[2]

## FACTS

Westview is an Indiana not-for-profit corporation that owns and operates Westview Hospital in Indianapolis, Indiana. It is recognized by the Internal Revenue Service as a 501(c)(3) organization.[3] HII, also an Indiana not-for-profit corporation with 501(c)(3) status, owns and operates a 158,000 square foot sports club and medical pavilion (facility) on Westview's campus. During the years at issue, Westview owned a 70% share of HII, as well as the land on which HII's improvement is constructed.[4]

### The Facility

Of the facility's 158,000 square feet, 74% is devoted to use as a sports club (Healthplex). The other 26% is devoted to use as the medical pavilion (MP).

at 8 *with* Pet'rs Br. *and* Oral Argument Tr.) Consequently, the Court deems the Petitioners' claim for the educational purposes exemption waived.

3. Internal Revenue Code § 501(c)(3) exempts from federal income taxes those corporations that meet specified criteria.

4. Westview leased this land to HII; it is part of Westview's hospital campus.

### 1. The Healthplex

The Healthplex is approximately 117,000 square feet in size. It contains: six tennis courts; racquetball and squash courts; one basketball court; a therapy pool; a one-eighth mile running track; a six lane, 25-yard lap pool; two aerobics rooms; a cardiovascular training/conditioning area (complete with treadmills and exercise bicycles); a strength training/conditioning area (complete with weight and strength machines); a children's gym; a childcare area; locker rooms; a health food deli; a pro shop and an administrative area.

The Petitioners state that the Healthplex is used 59% of the time as a community-oriented fitness facility. (*See* Pet'rs Br. at 9.) Accordingly, the Healthplex offers memberships to the public: for an initial, one-time fee of $209.00, plus a monthly fee of $69.50, individuals have unlimited access to the Healthplex's facilities.[5]

As part of its membership program, the Healthplex requires a member to receive a comprehensive health risk assessment, similar to a "mini-physical."[6] The member then meets with an on-staff exercise physiologist to develop and implement an exercise program consistent with the member's goals and health risk assessment results.[7]

The Petitioners state that the Healthplex is used the remaining 41% of the time to provide outpatient rehabilitation services, research, and community education. (Pet'rs Br. at 9.) More specifically, Westview's outpatients use the Healthplex for cardiac rehabilitation, physical and occupational therapy, arthritis therapy, and medically-supervised obesity reduction.[8] With respect to community education, the Healthplex typically offers to the public at least one free program per week. The programs cover various health and wellness topics such as cholesterol education,

---

5. The Healthplex also offers a variety of discounted memberships. For instance, spouses of current members may join for a discounted rate of $49.50 per month; monthly memberships for children range from $1.25 (for children between the ages of one and five) to $15.00 (for teens between 15 and 19); senior citizens pay monthly fees of only $59.50, and their spouses pay $39.50. Finally, the Healthplex allows "special populations" to use its facilities for little or no charge: residents of several area nursing homes/assisted living facilities are provided free transportation to and from the Healthplex to use the therapy pool for a nominal charge; members of Special Olympics teams may use the facilities for daily rates of $2.00 to $4.00; and several organizations conduct summer camps for inner city youth at the Healthplex for free.

6. The health assessment includes a fifteen-page health/family history questionnaire, a blood profile (measuring cholesterol and glucose levels), and tests measuring flexibility, muscular strength and endurance, and body composition.

7. In addition to providing these personalized services, the exercise physiologists are trained to supervise all exercise that occurs at the Healthplex, intervening when members are at risk of injuring themselves. The Healthplex also employs a physician as its medical director.

8. Those who use the Healthplex for rehabilitative purposes are not required to be members of the Healthplex: they pay no fees whatsoever for utilizing the Healthplex during their rehabilitative term. Those costs are typically passed through to, and covered by, the outpatient's insurance company. Once an outpatient has completed his or her rehabilitative term, they are free to continue to utilize the Healthplex by paying the monthly fee or by paying $4.00 per scheduled visit. The length of an outpatient's rehabilitative term is typically dictated by his or her doctor's recommendation as well as insurance coverage. (1st Cert. Admin. R. at 428–29, 497.) In any event, the Healthplex waives the $209 initiation fee for people who wish to continue their rehabilitation after insurance coverage stops.

first aid, stress management, and healthy cooking.

## 2. The MP

The MP portion of the facility is approximately 41,000 square feet in size. During the years at issue, an average [9] of approximately 11% of the MP was leased to physicians on staff at Westview, 37% of the space was used by various Westview Hospital departments (physical and occupational therapy, MRI, mammography, integrated medicine, and patient registration), and 44% of the facility was vacant.

In addition, approximately 7% of the MP served as a public/community education meeting room for use by HII and various other nonprofit community groups. Finally, approximately 1% of the MP was devoted to use as a boardroom. The boardroom was used 1%–2% of the time by the private physicians/tenants of the MP, and 98% of the time by Westview and another hospital for administrative purposes, as well as other various nonprofit community groups. Both the public meeting room and the boardroom were available for use free of charge.

## PROCEDURAL HISTORY

### 1. The 1999 Appeal

HII timely applied for a charitable purposes exemption, pursuant to Indiana Code § 6–1.1–10–16, for the 1999 tax year. More specifically, HII requested that the Healthplex portion of the improvement receive a 100% exemption; the MP portion of the improvement receive a 91% exemption; and all personal property receive a 100% exemption. The Marion County Property Tax Assessment Board of Appeals (PTABOA), however, only allowed a

9% exemption on the entire improvement.[10] The PTABOA did not address the personal property exemption sought by HII.

HII subsequently filed an appeal with the State Board of Tax Commissioners (State Board). The State Board held a hearing on the matter on February 17 and March 2, 2000. In a final determination dated October 11, 2000, the State Board upheld the PTABOA's determination. The State Board also determined that HII's personal property was entitled to a 9% exemption.

On October 26, 2000, HII sought a rehearing with the State Board. On November 21, 2000, the State Board issued a second final determination in which it removed the 9% exemption entirely. On December 20, 2000, HII initiated an original tax appeal.

### 2. The 2000 Appeals

On May 15, 2000, HII applied for the charitable purposes exemption for its improvement and personal property for the 2000 tax year. That same day, Westview also requested that 100% of its land (on which the HII improvement sat) receive the charitable purposes exemption for the 2000 tax year.

On June 26, 2000, the PTABOA allowed HII a 9% exemption on its improvement. The PTABOA denied the exemption for HII's personal property and Westview's land.

Both HII and Westview filed appeals with the State Board. The State Board held a hearing on the two appeals on February 5, 2001. In a final determination dated September 17, 2001, the State Board denied both HII and Westview's requests

---

9. The Court averaged the figures from both the 1999 and 2000 tax years.

10. This award was based on the fact that only 9% of the total facility was used by various departments of Westview Hospital.

for exemptions. HII and Westview initiated an original tax appeal on October 31, 2001.

This Court consolidated the 1999 and 2000 appeals on December 31, 2001. The Court heard the parties' oral arguments on July 28, 2003. Additional facts will be supplied as necessary.

### STANDARD OF REVIEW

 This Court gives great deference to the final determinations of the State Board when it acts within the scope of its authority. *Hamstra Builders, Inc. v. Dep't of Local Gov't Fin.*, 783 N.E.2d 387, 390 (Ind. Tax Ct.2003). Thus, this Court will reverse a final determination of the State Board only when its findings are unsupported by substantial evidence, arbitrary, capricious, constitute an abuse of discretion, or exceed statutory authority. *Id.*

 An exemption releases property from the obligation of bearing its fair share of the cost of government and serves to disturb the equality and distribution of the common burden of government upon all property. *See St. Mary's Med. Ctr. of Evansville, Inc. v. State Bd. of Tax Comm'rs*, 534 N.E.2d 277, 280 (Ind. Tax Ct.1989), *aff'd*, 571 N.E.2d 1247 (Ind.1991). Consequently, an exemption is strictly construed against the taxpayer and in favor of the State. *Id.*

### DISCUSSION AND ANALYSIS

In Indiana, all tangible property is subject to taxation. *See* IND.CODE ANN. § 6-1.1-2-1 (West 2004). Nevertheless, the Indiana Constitution provides that the legislature may exempt certain categories of property. *See* IND. CONST. art. X, § 1. The legislature exercised that constitutional power by enacting Indiana Code § 6-1.1-10-16(a), which provides that "[a]ll or part of a building is exempt from property taxation if it is owned, occupied, and used [ ] for ... charitable purposes." *See* IND. CODE ANN. § 6-1.1-10-16(a) (West 2004). This exemption also generally extends to the land on which the exempt building is situated, as well as personal property that is contained therein. *See* A.I.C. § 6-1.1-10-16(c), (e).

 The taxpayer bears the burden of proof in showing that it is entitled to the exemption it seeks. *See State Bd. of Tax Comm'rs v. New Castle Lodge # 147, Loyal Order of the Moose, Inc.*, 765 N.E.2d 1257, 1259 (Ind.2002). Thus, when seeking a charitable purposes exemption, the taxpayer must not only demonstrate that it owns, occupies, and uses its property for a charitable purpose, but also that the charitable purpose is the property's predominant use. *See State Bd. of Tax Comm'rs v. Fort Wayne Sports Club, Inc.*, 147 Ind. App. 129, 258 N.E.2d 874, 881 (1970) (stating that "it is the 'dominant use' of the property which determines whether such property is tax exempt").

*What constitutes a charitable purpose?*

 A charitable purposes exemption is granted when there is an expectation of a benefit that will inure to the public by reason of the exemption. "The rationale justifying a tax exemption is that there is a present benefit to the general public from the operation of the charitable institution sufficient to justify the loss of tax revenue." *Foursquare Tabernacle Church of God in Christ v. State Bd. of Tax Comm'rs*, 550 N.E.2d 850, 854 (Ind. Tax Ct.1990) (internal citation omitted).

 "Charity," as used in Indiana's property tax exemption statutes, is favored with the broadest constitutional definition allowable. *See Indianapolis Elks Bldg. Corp. v. State Bd. of Tax Comm'rs*, 145

Ind.App. 522, 251 N.E.2d 673, 682 (1969). Indeed:

> charity such as will justify an exemption is more than a seal, a charter, and social activities common to all of society. *There must be evidence of relief of human want,* and although the relief of such human want may alone be confined to [an] organization's membership, it must be *manifested by obviously charitable acts different from the everyday purposes and activities of man in general.*

*Id.* at 683 (emphases added).

Generally, "[h]ospitals maintained, not for pecuniary profit, but to relieve the destitute and deserving, are [ ] classed as [ ] charit[able]." *St. Vincent's Hosp. v. Stine,* 195 Ind. 350, 144 N.E. 537, 539 (1924), *rev'd in part on other grounds by* 250 Ind. 491, 237 N.E.2d 242 (1968). It is important to note, however, that if an exempt hospital owns other property, that other property does not automatically receive a charitable purposes exemption. Indeed, the charitable purposes exemption does not apply to other property owned by a hospital "that is not substantially related to or supportive of [its] inpatient facility[.]" A.I.C. § 6–1.1–10–16(h).

### What constitutes predominant use?

"In 1983 the [Indiana] legislature adopted a 'predominant use' test for determining whether property qualifies for [a charitable purposes] exemption under Ind[iana] Code [§] 6–1.1–10." *New Castle Lodge # 147,* 765 N.E.2d at 1259 (*citing* 1983 Ind. Acts 66). To that end, Indiana Code § 6–1.1–10–36.3 provides in relevant part:

> (a) For purposes of this section, property is predominantly used or occupied for [a charitable purpose] if it is used or occupied for [a charitable] purpose[ ] during more than fifty percent (50%) of the time that it is used or occupied in the year that ends on the assessment date of the property.
>
> (b) If a section of this chapter states one (1) or more purposes for which property must be used or occupied in order to qualify for an exemption, then the exemption applies as follows:
>
> (1) Property that is exclusively used or occupied for [a charitable] purpose[ ] is totally exempt[;]
>
> (2) Property that is predominantly used or occupied for [a charitable] purpose[ ] by a church, religious society, or not-for-profit school is totally exempt[;]
>
> (3) Property that is predominantly used or occupied for [a charitable] purpose[ ] by a person other than a church, religious society, or not-for-profit school is exempt . . . on the part of the assessment . . . that bears the same proportion to the total assessment of the property as the amount of time that the property was used or occupied for [the charitable] purpose[;]
>
> (4) Property that is predominantly used or occupied for a purpose other than one (1) of the stated purposes is not exempt from any part of the property tax.

IND.CODE ANN. § 6–1.1–10–36.3(a), (b) (West 1999) (amended 2003).

### The Parties' Arguments

The Petitioners argue that the Healthplex portion of its facility is entitled to a 100% charitable purposes exemption because its use for the promotion of health through physical activity provides a public benefit sufficient to justify the loss in tax revenue. (*See* Pet'rs Br. at 29.) More specifically, during the administrative hearing process, the Petitioners entered into evidence the 1996 United States Sur-

geon General's published report entitled *Physical Activity and Health.* (*See* 2nd Cert. Admin. R. at 801–1080.) The report links various health problems with sedentary lifestyle, recognizes that approximately 98% of annual health care costs are spent on diagnosing and treating illness as opposed to preventing illness, and calls physical activity an essential objective for the nation that should be given the same level of attention as other important public health practices. (*See* Pet'rs Br. at 10.) Thus, the Petitioners maintain that "[t]he purpose of the Healthplex is to respond to the Surgeon General's Report by encouraging people to become regularly physically active so that the health benefits documented by the Surgeon General can be realized and so that the high cost of diagnosis and treatment can be reduced." (Pet'rs Br. at 10, 15–16.) (*See also* 2nd Cert. Admin. R. at 1138.)

Furthermore, the Petitioners explain that "Indiana courts have long recognized the charitable nature of hospitals because such institutions care for the sick, infirmed and aged, and in turn, relieve burdens that government would otherwise bear." (Pet'rs Br. at 29 (internal citations omitted).) In turn, the Petitioners argue that "there should be no legal difference between the delivery of health care in the traditional sense (i.e., to treat an existing disease, illness or condition) and the activities ... aimed at preventing disease in the first instance." (Pet'rs Br. at 31.) Consequently, "[e]ducating the public about the benefits of physical activity, providing an appropriate place to engage in physical activity and customizing exercise programs to meet the individual needs of Healthplex users are all charitable purposes because the clear aim of such activities is to prevent the known maladies documented by the Surgeon General's Report[.]" (Pet'rs Br. at 31.) To this end, the Healthplex is

affordable and "accessible to the public at large." (Pet'rs Br. at 25, 39.)

With respect to the MP portion of the facility, the Petitioners argue that they are entitled to a 91% exemption. More specifically, while the Petitioners concede that the portion of the MP leased to physicians is not exempt from property taxation, (Pet'rs Br. at 47), they maintain that the remainder of the MP is exempt. As they explain, the portion of the MP used by various Westview Hospital departments is clearly exempt, and both the boardroom and public meeting rooms are exempt because their use is "reasonably necessary to and supportive of the charitable activities [ ] carried on in the [overall b]uilding." (Pet'rs Br. at 47.) Furthermore, with respect to the 44% of the space in the MP that is vacant, "because it is not being used for non-charitable purposes, and because the overwhelming majority of the remainder of the [b]uilding is used for exempt purposes, the vacant space should also be exempt." (Pet'rs Br. at 47.)

The State Board argues, on the other hand, that the facility is essentially a commercial health club that is neither affordable nor accessible. (*See* 1st Cert. Admin. R. at 68–71; 2nd Cert. Admin. R. at 193–97.) In turn, the State Board determined that the use of the facility as a health club does not constitute a charitable purpose: "[r]egardless of the Surgeon General's [r]eport ... care for the sick or injured is a substantially different purpose from promoting exercise and general physical fitness." (Resp't Br. at 16.) (*See also* 1st Cert. Admin. R. at 68–71; 2nd Cert. Admin. R. at 193–97.) In other words, "[t]he Healthplex does not provide relief of human want or suffering in any manner that is different from the everyday purposes and activities of man in general." (Resp't Br. at 25.) Thus, there simply is not

"enough public benefit ... to justify tax exemption." (Resp't Br. at 24.)

In the alternative, the State Board claims that "[a]ssuming *arguendo* that the Healthplex would qualify for exemption for the percentage of time used for rehabilitation [and 'indigent' use through the special populations program], such use does not fall within the perimeters of 'predominant' and, thus, [it] does not qualify for exemption on this basis." (1st Cert. Admin. R. at 72; 2nd Cert. Admin. R. at 198.) Likewise, the State Board determined that the only portion of the MP eligible to receive an exemption was the portion used by various Westview Hospital departments. That portion, too, did not meet the predominant use test. (1st Cert. Admin. R. at 72; 2nd Cert. Admin. R. at 198–99.)

*The Court's Holding*

### 1. The Healthplex

The issue with respect to the Healthplex portion of the facility—whether the promotion of health through physical activity constitutes a charitable purpose—is one of first impression in this state. Nevertheless, the issue has been much debated in other jurisdictions across the country.

Several jurisdictions have upheld the application of a charitable purposes exemption to a community sports/athletic facility. *See, e.g., Clubs of California for Fair Competition v. Kroger*, 7 Cal.App.4th 709, 9 Cal.Rptr.2d 247 (Cal.Ct.App.1992); *Decatur Sports Found. v. Illinois Dep't of Revenue*, 177 Ill.App.3d 696, 126 Ill.Dec. 891, 532 N.E.2d 576 (1988); *Coeur d'Alene Pub. Golf Club, Inc. v. Kootenai Bd. of Equalization*, 106 Idaho 104, 675 P.2d 819 (1984). For the most part, the holdings in these cases have turned on whether the community sports/athletic facility has relieved a governmental burden or otherwise overwhelmingly provided a general public benefit. In contrast, several other jurisdictions have specifically held that a hospital's operation of a public fitness facility is, more often than not, used only for purposes incidental to the operation of the hospital and therefore not exempt. *See Bethesda Healthcare, Inc. v. Wilkins*, 101 Ohio St.3d 420, 806 N.E.2d 142 (2004); *Hillcrest Health Serv. Sys., Inc. v. Hackensack City*, 18 N.J.Tax 38 (N.J. Tax Ct.1998).

Although these holdings are by no means binding on this Court, their logic is both instructive and persuasive. *See USAir, Inc. v. Indiana Dep't of State Revenue*, 623 N.E.2d 466, 469 n. 4 (Ind. Tax Ct.1993). In particular, the Court finds one especially persuasive—a 1994 Tennessee Court of Appeals case with facts very similar to the case at bar.

At the outset, the Tennessee court recognized the emerging trend in the hospital industry: the creation of so-called "wellness centers" to promote exercise and healthy life styles. *Middle Tennessee Medical Cntr. v. Assessment Appeals Comm'n of the State of Tennessee*, 1994 WL 32584, at *4 (Tenn.Ct.App.1994), *review denied*. And while the court acknowledged that such centers often have strong medical philosophies, employing physicians and exercise physiologists and offering programs tailored expressly for hospital inpatients and outpatients, they are, nonetheless, not limited to use by those requiring "traditional" medical care. *Id.*

Indeed, the court found that members of these fitness centers include people from all walks of life who pay membership costs comparable to those charged by private for-profit health spas for the use of similar exercise facilities. *Id.* Furthermore, these members may choose from a great variety of programs, all directed in one way or another towards the goal of health: "the entire menu of programs offered by

the[se centers] is expressive of a growing trend in healthcare to look towards prevention rather than waiting until a patient requires treatment." *Id.*

In determining whether the subject hospital's exercise center was eligible for Tennessee's charitable purposes exemption [11], however, the court explained that

> [w]hile we find this trend towards healthful activity and prevention a promising development, we note that tax-paying enterprises in the [area] offer many of the same programs that th[is c]enter does. Competition with for-profit businesses is not dispositive of a petition for a charitable tax exemption, but the presence of such competition is a relevant factor.
>
> \* \* \* \* \* \*
>
> Th[is c]enter ... advertises its programs to the general public, who are free to choose between [it] and other exercise facilities in the same area. We have mentioned the three categories of hospital patients whose participation in the programs of the [c]enter is required by their physicians, but the great majority of those who use the [c]enter are not under a doctor's care. They have chosen the [c]enter over competing health spas for reasons of their own, and it is not the role of this court to encourage that choice by according the [c]enter a more favorable tax treatment than that permitted to its competitors.
>
> We feel it would be a misuse of the tax exemption granted to charitable hospi-

tals if every revenue-generating venture they embarked upon automatically benefited from the exemption, so long as that venture could be characterized as in some way promoting health. We are conscious, however, that medicine is a rapidly changing discipline, and that hospitals must be responsive to new developments in medical practice. We therefore will not attempt to create some hard and fast rule to fix forever the tax status of wellness centers owned by charitable hospitals. Each case must stand on its own facts.

*Id.*

This Court adopts, as its own, the holding in the Tennessee case. As a result, the State Board did not err when it determined that the Healthplex portion of the facility did not qualify for the charitable purposes exemption.[12] The State Board's final determination with respect to the application of the charitable purposes exemption to the Healthplex is therefore AFFIRMED.

### 2. The MP

■ This Court's holding with respect to the MP portion of the facility is, however, somewhat different. Indeed, the Court finds that the State Board abused its discretion in determining that none of the MP qualified for the charitable purposes exemption.

As stated *supra,* the charitable purposes exemption may apply to all or part of another building owned by a hospital if it is "substantially related to or supportive of

---

11. Tennessee's statute provides, in pertinent part:

> There shall be exempt from property taxation the real and personal property, or any part thereof, owned by any religious, charitable, scientific or educational institution which is occupied and used by such institution or its officers purely and exclusively for carrying out thereupon one (1) or more of

the purposes for which said institution was created or exists[.]

Tenn.Code Ann. § 67–5–212 (1994).

12. Because the Court has determined that the Petitioners have not shown that the Healthplex portion of the facility is used for a charitable purpose, it is unnecessary to address "predominant use."

[its] inpatient facility[.]" A.I.C. § 6–1.1–10–16(h). It is clear from the record that 37% of the space in the MP is used 100% of the time by various Westview Hospital departments. Such use is substantially related to or supportive of Westview's inpatient facility. Likewise, the record clearly indicates that the boardroom is predominantly used (i.e., 98% of the time) for hospital administrative meetings, which is also substantially related to Westview's inpatient facility. Accordingly, the MP portion of the facility is entitled to a 38% exemption.[13] The State Board's final determination with respect the MP portion of the facility is, therefore, REVERSED.

### 3. Other

■ The Petitioners claim that in denying them the charitable purposes exemption for the Healthplex, the State Board has violated Article 1, § 23 of the Indiana Constitution, which provides: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens." IND. CONST. art. I, § 23.

According to the Petitioners, the State Board granted a charitable purposes exemption to the Jewish Community Center (JCC), which owns a building in Indianapolis.[14] Essentially, the Petitioners claim that this treatment provides the JCC with a privilege not equally shared by members of the same class (i.e., the facility) because

> [f]rom a physical standpoint, the Healthplex and the JCC fitness facility are

almost identical. The difference is that [the Healthplex offers more than the JCC:] the JCC fitness facility lacks the health care programs present at the Healthplex. The JCC fitness facility operates like the Healthplex with respect to healthy members, but has no special programs for seniors, special populations or people with special health care needs. The JCC has no medical director. The JCC has a small physical therapy area run by Community Hospital that is not integrated into the JCC's facility as in the case of the Healthplex. The JCC conducts no educational programs related to health care. Unlike the Healthplex, the JCC performs no screening or health risk assessment.

(Pet'rs Br. at 22–23 (internal citations omitted).) "[T]he State Board ha[s not] proffered a rational basis for distinguishing between JCC and HII in this regard." (Pet'rs Br. at 27 (footnote added).)

■ In order to survive constitutional scrutiny, claims asserted under Article 1, § 23 must pass the two-part test enunciated in *Collins v. Day*, 644 N.E.2d 72 (Ind. 1994). First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. *Id.* at 78–79. In other words, "[t]here must be some inherent and substantial difference germane to the subject and purpose of the legislation [creating the distinction] between those included within

---

**13.** As the Petitioners have conceded, the portion of the MP leased to physicians is not exempt. (Pet'rs Br. at 47.) Furthermore, the State Board did not err in determining that the exemption did not apply to the portion of the MP that is vacant. Indiana Code § 6–1.1–10–16 clearly provides that the exemption applies only to that portion of the building that is "owned, occupied, *and used*" for charitable purposes. IND.CODE ANN. § 6–1.1–10–16(a)

(West 2004) (emphasis added). An exempt use will not be imputed to vacant space.

**14.** The JCC building houses a day care facility and fitness center with indoor tennis and racquetball courts, a basketball court, an indoor running track, cardiovascular equipment, free-weight and strength equipment, whirlpool, swimming pool, locker rooms, and a café.

the class and those excluded." *Id.* at 78 (*quoting School City of Elwood v. State,* 203 Ind. 626, 180 N.E. 471, 474 (1932)). Second, the preferential treatment accorded by the legislation must be uniformly applicable and equally available to all persons similarly situated. *Id.* at 79. The Petitioners claim that the first prong of the *Collins* test is not at issue in this case. (*See* Pet'rs Br. at 52.) Rather, they focus their argument on the second prong of the *Collins* test.[15]

Consequently, in its analysis, this Court must ensure that the preferential treatment provided by the charitable purposes exemption is uniformly applicable to all similarly situated persons. *See Collins,* 644 N.E.2d at 79. The Petitioners argue that it is not: "[b]oth [the JCC and the Petitioners] applied for exemptions for the same use of that portion of their buildings devoted to fitness purposes. . . . There is no rational basis for exempting JCC's fitness facility and taxing the Healthplex's fitness facility." (Pet'rs Br. at 53.)

To support its claim, the Petitioners submitted, at the administrative hearing, JCC's exemption applications filed for the 1996 and 2000 tax years. (*See* 2nd Cert. Admin. R. at 766–83.) In addition, the Petitioners relied on the testimony of Stephen Robbins (Robbins), the president of Pennsylvania Health Clubs.[16] This combined evidence, however, fails to support the Petitioners' claim for several reasons.

First, JCC's exemption applications state that it uses its property for the following charitable purposes: "community meeting places, education of children" and "social services, religious education[,] nursing home[,] group home[,] fundraising." (2nd Cert. Admin. R. at 770, 774.) JCC makes no mention, however, of its fitness facility. Consequently, there is no evidence in the record indicating the actual basis of JCC's exemption, let alone whether it received the exemption on the basis of its fitness facility.[17]

In light of this, Robbins' testimony comparing the JCC to the Healthplex is of little help.[18] Indeed, Robbins stated that the JCC is

operating very similar to the Healthplex. It has three primary functions as I saw it. Number 1, it operates as a Jewish Cultural Center. They have a garden there that's dedicated to the Holocaust. It[']s very nice. It[']s kind of a passive type operation that's just operating for that purpose. Then there is a daycare type facility[.] And then finally is the Fitness Center which really is the dominant theme there.

(2nd Cert. Admin. R. at 1125–26.) Nevertheless, Robbins' testimony does not indicate how those three functions break out in terms of the JCC's overall use. Thus, there is no way to determine how predomi-

---

**15.** In other words, the Petitioners are not challenging the constitutionality of Indiana Code § 6–1.1–10–16 *per se,* but rather on an *as applied* basis.

**16.** Robbins testified that Pennsylvania Health Clubs was engaged to provide contract management services to the Healthplex facility. (*See* 2nd Cert. Admin. R. at 1121.)

**17.** Furthermore, during the administrative hearing, David Dyar, HII's board chairman, indicated that while it appeared from the Indianapolis Business Journal that the JCC re-

ceived the exemption, "I haven't done that research to look into exactly what that's all about[.]" (2nd Cert. Admin. R. at 760.) In other words, Dyar admitted that he had neither "seen [JCC's] case for their exemption" nor had he reviewed its application or programming. (2nd Cert. Admin. R. at 759, 762.)

**18.** Robbins' testimony was based on two visits he made to the JCC. (1st Cert. Admin. R. at 1125.)

nant use may have figured into JCC's exemption allowance. For instance, if each of the three functions accounted for 33% of the use, and the State Board determined that both the cultural center and the day-care constituted charitable purposes, then the JCC, as a religious society, may have received the exemption in its entirety because it was predominantly used (66% of the time) for charitable purposes. *See* A.I.C. § 6–1.1–10–36.3(b)(2).

Given the evidence in the record, this Court is not convinced that the JCC and Healthplex/MP are similarly situated. Consequently, the Petitioners have not met the second prong of the *Collins* test, and therefore have not shown that Indiana Code § 6–1.1–10–16, as applied, violates Article 1, § 23 of the Indiana Constitution.

## CONCLUSION

For the foregoing reasons, this Court AFFIRMS the State Board's final determinations in part and REVERSES them in part. The final determinations are therefore REMANDED to the Indiana Board of Tax Review for action consistent with this opinion.[19]

---

19. All cases that would have previously been remanded to the State Board are now remanded to the Indiana Board of Tax Review (Indiana Board). IND.CODE ANN. § 6–1.1–15–8 (West 2004). Final determinations made by the Indiana Board are subject to review by this Court pursuant to Indiana Code § 6–1.1–15. IND.CODE ANN. §§ 6–1.5–5–7; 33–26–3–1 (West 2004).